IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES                                    *

vs.                                              *        Case No.: 22-cr-15-APM

THOMAS E. CALDWELL                               *
(U.S. v. Elmer Stewart Rhodes)

      *    *    *    *    *    *    *    *    *    *    *

## MOTION TO DISMISS COUNTS 1, 2, 3, & 4 OF THE INDICTMENT

The Defendant, Thomas E. Caldwell, by and through his attorney, David W.

Fischer, Esq., moves this Honorable Court, pursuant to Federal Rule of Criminal

Procedure 12(b)(3)(B)(v), to dismiss Counts 1-4 of the Indictment as set forth *infra*.

### Procedural Background

On January 12, 2022 the grand jury returned a multi-count Indictment ("the

Indictment") charging Thomas E. Caldwell ("Caldwell") and eleven other defendants

("the *Rhodes* defendants")[1] with Count 1, seditious conspiracy (18 U.S.C. § 2384); Count

2, conspiracy to obstruct an official proceeding (18 U.S.C. § 1512(k)); Count 3,

obstruction of an official proceeding and aiding and abetting (18 U.S.C. § 1512(c)(2), 2);

Count 4, conspiracy to prevent an officer from discharging any duties (18 U.S.C. § 372);

---

[1] On March 3, 2022 co-defendant Joshua James entered a guilty plea in this matter. (ECF
60).

Count 5, destruction of government property and aiding and abetting (18 U.S.C. § 1361, 2); Counts 6-7, civil disorder and aiding and abetting (18 U.S.C. § 231(a)(3), 2); Count 8, assaulting, resisting, or impeding certain officers (18 U.S.C. § 111(a)(1)); and Counts 9-17, tampering with documents or proceedings and aiding and abetting (18 U.S.C. §§ 1512(c)(1), 2).

The Indictment in this case is an off-shoot of the Government's previous indictments in *United States v. Caldwell* (APM-21-28).   The Court denied various motions to dismiss certain counts in *Caldwell*.   *See Caldwell*, (ECF 558).   The Court has made clear that the *Rhodes* defendants, to the extent applicable, may rely on the previously filed and argued motions to dismiss in *Caldwell* as "the law of the case" in the instant matter for purposes of appeal.   In addition to those preserved motions, Caldwell files the instant motion to dismiss as to Counts 1-4 of the *Rhodes* Indictment.

### Factual Background

The *Rhodes* defendants were charged in relation to events surrounding their alleged involvement in the unfortunate events that occurred at the United States Capitol Building on January 6, 2021 ("J6").   As a motion to dismiss centers on the allegations stated within the four-corners of the Indictment, and as the Court is obviously familiar with the factual background of J6 and the *Rhodes* defendants, Caldwell will dispense with a lengthy statement of facts.

## Legal Standard

The Federal Rules of Criminal Procedure state that an indictment must include "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). A motion to dismiss may challenge "a defect in the indictment" if "the basis of the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B). If, for example, the indictment fails to "state an offense," a defendant can move for dismissal. Fed. R. Crim. P. 12(b)(3)(B)(v). In ruling on a defendant's motion to dismiss, the Court must assume that the factual allegations in the indictment are true and limit its review to "the *face* of the indictment, and more specifically, the *language used* to charge the crimes." *United States v. Sunia*, 643 F. Supp. 2d 51, 59-60 (D.D.C. 2009) (internal quotation marks omitted). The issue that the Court is required to address in response to a defendant's motion to dismiss is thus: "[W]hether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed." *United States v. Bowdoin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011).

## Summary of Argument

The *Rhodes* defendants seek dismissal of Counts 1-4 on the grounds that the Indictment fails to state an offense as to each count. Count 1, seditious conspiracy pursuant to 18 U.S.C. § 2384, requires proof that the *purpose* of the defendants' seditious conspiracy was to forcibly obstruct a person authorized to execute a law, while that person was attempting to execute the particular law opposed by the defendants. The

Indictment alleges that Members of Congress were obstructed in executing the election laws.   Per binding precedent, however, Members of Congress are constitutionally prohibited from "executing any law of the United States."   Additionally, per binding precedent, the Electoral College certification process did not constitute the "execution of any law of the United States."   Accordingly, the Indictment fails to state an offense as it does not allege that the *Rhodes* defendants conspired to forcibly obstruct a person duly authorized to "execute any law of the United States" in their actual, or attempted, execution of the opposed law.

Counts 2 & 3, which charge conspiracy and obstruction in relation to an official proceeding under, respectively, 18 U.S.C. § 1512(k) and § 1512(c)(2), fail to state offenses, because the plain language of 18 U.S.C. § 1512(c) confirms that this statute only applies to obstructive acts related to tangible evidence spoliation.   The word "otherwise" in § 1512(c)(2) is a conjunctive adverb which, by traditional grammatical rules, means that the adverbial clause, i.e., subsection (c)(2), is not independent but, rather, modifies the opening clause, i.e., subsection (c)(1).   Accordingly, subsection (c)(2) was intended by Congress to criminalize similar, but unenumerated, conduct as outlined in subsection (c)(1).   As the *Rhodes* defendants' actions were unrelated to tangible evidence spoliation, Counts 2 & 3 fail to state offenses.

Count 4 charges the *Rhodes* defendants with conspiracy to prevent an officer from discharging any duties in violation of 18 U.S.C. § 372.   Binding precedent holds that the terms "office," "officer," and "officer of the United States," as used in federal criminal

statutes, are, absent unambiguous language to the contrary, presumed to have their

"constitutional meaning" as set forth in the Appointments Clause of the Constitution

(Article II, § 2, cl. 2).   The "officers" cited as victims in Count 4 are Members of

Congress, who are not "officers" under the Appointments Clause.   As Members of

Congress are not Article II "officers," they likewise are not "officer[s] of the United

States" as that term is used in § 372.   Additionally, § 372's reference to preventing a

"person from accepting . . . any office, trust, or place of confidence" clearly excludes

Members of Congress, who do not "accept" their offices but, rather, assume them.   The

phrase "office, trust, or place of confidence," moreover, is a clear reference to language

used in presidential commissions issued to "officers of the United States," confirming

that Members of Congress, who do not receive commissions, are not protected by the

statute.   Accordingly, Count 4 must be dismissed, as it fails to state an offense.


I.      <u>Count 1 Fails to Allege a "Seditious Conspiracy"</u>

Count 1 of the Indictment charges the *Rhodes* defendants with seditious

conspiracy pursuant to 18 U.S.C. § 2384.   The Indictment alleges that the *Rhodes*

defendants "did knowingly conspire . . . by force to prevent, hinder, and delay the

execution of any law of the United States[.]"   (ECF 1, ¶15).   The *purpose* of the

seditious conspiracy, according to the Indictment, was

> to oppose the lawful transfer of presidential power by force, by preventing,
> hindering, or delaying by force the execution of the laws governing the

transfer of power, including the Twelfth and Twentieth Amendments to the
Constitution and Title 3, Section 15 of the United States Code.

(ECF 1, ¶16).   Section 2384, which sets forth the crime of "seditious conspiracy," in turn

states:

> If two or more persons in any State or Territory, or in any place subject to
> the jurisdiction of the United States, conspire to overthrow, put down, or to
> destroy by force the Government of the United States, or to levy war
> against them, or to oppose by force the authority thereof, *or by force to
> prevent, hinder, or delay the execution of any law of the United States*, or
> by force to seize, take, or possess any property of the United States contrary
> to the authority thereof, they shall each be fined under this title or
> imprisoned not more than twenty years, or both.

18 U.S.C. § 2384 (emphasis added).   The Indictment specifically charges the *Rhodes*

defendants with the italicized portion of § 2384, i.e., a conspiracy to forcibly "prevent,

hinder, or delay the execution of any law of the United States."   (ECF 1, ¶15).

For purposes of the instant motion, the *Rhodes* defendants concede that the

Government has *alleged*[2] a conspiratorial agreement to use force intended to disrupt the

---

[2] While a motion to dismiss addresses the Indictment's facial sufficiency and not the
weight of the evidence, the *Rhodes* defendants emphasize that the Indictment is an
obscenely one-sided, selectively edited, and inaccurate representation of their actions and
statements.   Counsel for the *Rhodes* defendants have combed through a mountain of
discovery, which includes the cell phone "dumps" of every defendant.   Included within
discovery for every *Rhodes* and *Crowl* defendant are their text messages, Facebook
messages, phone records, encrypted chats, etc.   Literally tens of thousands of private
communications within the Oath Keepers organization have been provided, including
encrypted messages specifically addressing preparations for J6.   Additionally, multiple
302s, witness statements, un-Mirandized statements, etc. from multiple Oath Keeper-
related witnesses and defendants have been reviewed.   At least 20 FBI and ATF assets
were embedded around the Capitol on J6.   Additionally, discovery proves that the Oath
Keepers were being monitored and recorded *prior* to J6.   Yet, to this day, defense

Electoral College certification on January 6, 2021.   The issue presented to the Court,

accordingly, is whether the *Rhodes* defendants, per the factual allegations in the

Indictment, conspired to obstruct the "execution" of the elections laws.   As explained

*infra*, the Indictment makes no such allegation.

**A.  <u>A plain reading of § 2384 suggests that a seditious conspiracy must be targeted at a person authorized under Article II to execute the opposed law</u>.**

A plain reading of § 2384 suggests that, to violate the statute, the conspiracy

alleged must be specifically aimed at a person authorized under Article II of the

Constitution to execute the law opposed by the defendants.   Section 2384 criminalizes

conspiracies to "[forcibly] prevent, hinder, or delay *the execution* of any law of the

United States."   18 U.S.C. § 2384 (emphasis added).   Importantly, § 2384 does *not*

focus on conspiracies to obstruct "*any law* of the United States."   Instead, the statute's

text squarely targets conspiracies to obstruct "*the execution* of any law of the United

States."   This distinction is critical:   obstructing *a law* is not the same as obstructing *the*

*execution* of a law.   Since laws do not "execute" themselves, the target of the seditious

conspiracy, logically, must be *both* the federal law itself and at least one person

attempting to execute that law.   Next, as the statute protects at least one person

"executing" a law, it can be logically inferred that, to be included within the statute's

---

counsel have not found one iota of proof that the *Rhodes* or *Crowl* defendants had any plan, intention, design, or scheme to *specifically enter the Capitol Building* on J6.   And every scrap of evidence reviewed confirms that the "QRFs," which were utilized on numerous prior dates, were intended as rescue forces in the event that the Oath Keepers were attacked by Antifa or a similar contingency, and not to attack the Capitol Building.

reach, the person executing the opposed law must be *authorized* to do so.   It would seem odd, after all, for Congress to punish conspiracies aimed at individuals *un*authorized to execute the law.   Finally, "execution of [the] law" is a constitutionally loaded term, which strongly suggests that the 1) person; 2) who is authorized; 3) to execute; 4) the federal law in question falls under Article II of the United States Constitution, i.e., under the authority of the President of the United States, who has plenary power to "execute" federal law.

The historical context surrounding the passage of what is now § 2384 reifies this plain reading of the statute.   The seditious conspiracy statute was not passed in a vacuum.   Originally enacted on July 31, 1861 during the Civil War, the "Act to Define and Punish Certain Conspiracies" ("1861 Act") provided that if two or more persons conspired together

> . . .   [t]o overthrow, or to put down, or to destroy by force, the Government of the United States, or to oppose by force the authority of the Government of the United States; or by force to prevent, hinder, or delay the execution of any law of the United States; or by force to seize, take, or possess any property of the United States against the will or contrary to the authority of the United States; or by force, or intimidation, or threat to prevent any person from accepting or holding any office, or trust, or place of confidence, under the United States . . . [they] shall be guilty of a high crime. . .[.]

12 Stat. 284 (1861).   The 1861 Act was the product of a special session of Congress

convened on July 4, 1861, which was summoned by President Lincoln to address the

growing rebellion in the South.[3]

In his April 15, 1861 proclamation requesting the special session of Congress,

Lincoln called forth 75,000 men, to be drawn from the militia of the states, for the

purpose of quashing the accelerating Southern exodus from the Union:

> *Whereas the laws of the United States have been for some time past and now are opposed and the execution thereof obstructed* in the States of South Carolina, Georgia, Alabama, Florida, Mississippi, Louisiana, and Texas *by combinations too powerful to be suppressed* . . .  I . . . call forth[] the militia of the several States of the Union to the aggregate number of 75,000 in order *to suppress said combinations and to cause the laws to be duly executed*.[4]

When Congress passed the seditious conspiracy statute in July of 1861, eleven Southern

States had already seceded and scores of forts, outposts, installations, ships, and civilian

departments belonging to the U.S. Government had been seized throughout the South.[5]

---

[3]  *See* Address of President Lincoln to a Special Session of Congress (July 4, 1861) (transcript from Miller Center of the Univ. of Virginia), https://millercenter.org/the-presidency/presidential-speeches/july-4-1861-july-4th-message-congress.

[4]  Proclamation No. 80 of President Lincoln (April 15, 1861) (Univ. of Cal. at Santa Barbara), https://www.presidency.ucsb.edu/documents/proclamation-80-calling-forth-the-militia-and-convening-extra-session-congress (emphasis added).

[5]  *See* Lincoln Address to Congress (July 4, 1861), *supra* at n. 3.

Accordingly, Lincoln federalized the state militias, thus putting them under his Article II wings,[6] and used them to enforce martial law in the South and border states.

It's no coincidence that Congress passed a sweeping statute combatting conspiracies to obstruct the "execution of laws" just as Lincoln had called forth tens of thousands of men to "cause the laws to be duly executed" by countering those who "now are opposed" to the laws.   And unlike the crime of treason, which required an "overt act" to complete the crime, the 1861 Act's list of crimes required no such overt act.[7]   In other words, the military and federalized Article II militia were empowered to preemptively

---

[6] Lincoln's authority to federalize the state militias and place them under his Article II authority was pursuant to the Militia Act of 1795, which stated:

> That whenever the laws of the United States shall be opposed or the
> execution thereof obstructed . . . by combinations too powerful to be
> suppressed . . . it shall be lawful for the President of the United States to
> call forth the militia . . . to suppress such combinations, and cause the law
> to be duly executed.

Militia Act of 1795, § 2 (1795).

[7] Enacting the crime of seditious conspiracy accomplished two things for the Union war effort.   First, as the crime did not require an overt act, the threshold for probable cause to arrest was much lower than treason.   Second, as it would have been politically impossible for Lincoln to seek the death penalty (the punishment for treason) against hundreds of thousands of Confederates and their sympathizers, this new statute provided a non-capital alternative.   As Professor Wharton noted:   "[Holding all] persons engaged in countenancing the rebellion to be guilty of treason, and, upon prosecution and conviction, to sentence them to be hung, would by making the crime national, prevent it from being punished."   3 WHARTON, A TREATISE ON THE CRIMINAL LAW, 2299, § 2142, n. 7 (12th ed. 1912) (*cited* in C. Tarrant, *To "insure domestic Tranquility": Congress and the Law of Seditious Conspiracy, 1859-61*, 15 Amer. J. of Legal Hist. 107, 118 (1971)).

arrest Confederate sympathizers, who in turn could be held indefinitely, as Lincoln had suspended writs of *habeas corpus*.[8]

It was against the backdrop of Lincoln invoking martial law in rebellious areas and suspending *habeas corpus* writs that what is now § 2384 passed.   The purpose of § 2384 was to suppress the potential destruction of the Union by providing military authorities a hammer to silence dissenters by proactively arresting and detaining Confederate sympathizers (i.e., those opposed to military force against the South) on grounds that would shock modern civil libertarians.[9]   Not surprisingly, "no convictions during the Civil War period can be found . . . for indictments which were brought for [seditious conspiracy]" as the "[Lincoln] Administration preferred simply to detain individuals with or without indictments as the situation required[.]"   *See* Catherine Tarrant, *To "insure domestic Tranquility": Congress and the Law of Seditious Conspiracy*, *1859-1861*, 15 AMER. J. OF LEGAL HIST. 107, 121-22 (1971).   While all criminal statutes should be strictly construed, § 2384, which was passed during a rebellion, should be particularly scrutinized.

---

[8]  *See supra*, n. 3.
[9]  For example, on August 7, 1861 Lincoln ordered the arrests of all Confederate-sympathizing members of the Maryland General Assembly, even those who were not in favor of secession.
https://www2.umbc.edu/che/tahlessons/pdf/Maryland_During_the_Secession_Crisis_RS_7.pdf

**B. The Supreme Court has ruled that a seditious conspiracy must be aimed at those authorized to execute the opposed law.**

In *Baldwin v. Franks*, the United States Supreme Court set forth the elements of seditious conspiracy.   In *Baldwin*, the defendant was charged with seditious conspiracy for conspiring to kidnap and expel a group of Chinese immigrants from their homes and businesses in a central California town.   *Baldwin v. Franks*, 120 U.S. 678, 681 (1887).  The defendant's actions took place subsequent to the approval of a treaty between the United States and China, wherein the United States agreed to take steps to protect Chinese immigrants from mistreatment.   *Id*. at 681-82.   The Court held that the defendant's conduct did not support a charge of seditious conspiracy because the use of force was exerted against the Chinese immigrants, not against the government in its efforts to protect them under the terms of the treaty:

> [T]he second . . . offence consists in preventing, hindering, or delaying the government of the United States in the execution of its laws. This . . . means something more *than setting the laws themselves at defiance*. There must be a *forcible resistance of the authority of the United States while endeavoring to carry the laws into execution*. The United States are bound by their treaty with China to exert their power to devise measures to secure the subjects of that government lawfully residing within the territory of the United States against ill treatment, *and if in their efforts to carry the treaty into effect they had been forcibly opposed by persons who had conspired for that purpose*, a state of things contemplated by the statute would have arisen. But that is not what Baldwin has done. His *conspiracy* is for the ill treatment itself, and *not* for hindering or delaying the United States *in the execution of their measures to prevent it*. His force was exerted against the Chinese people, and *not against the government in its efforts to protect them*.

*Id*. at 693-94 (emphasis added).   According to *Baldwin*, to be guilty of seditious conspiracy, "there must be forcible resistance" against federal authorities while "endeavoring to carry the laws into execution."   *Id*. at 693.   The crime was not "setting the laws [protecting Chinese immigrants] themselves at defiance"; rather, to engage in "seditious conspiracy," the Government had to prove that the *purpose* of the conspiracy was "hindering or delaying the United States in the *execution of their measures[.]*"   *Id*. (emphasis added).

        In the aftermath of World War I, two federal appellate courts applied *Baldwin* to seditious conspiracy cases.   In *Anderson v. United States*, a case out of the U.S. Court of Appeals for the Eighth Circuit, the defendants were convicted of seditious conspiracy for obstructive acts relating to World War I and conscription laws including, *inter alia*, distributing subversive periodicals and organizing labor strikes in war-related factories. *Anderson v. United States*, 273 F. 20, 22-23 (8th Cir. 1921).   The Eighth Circuit overturned the defendants' convictions, finding that the Government "wholly fail[ed] to charge an offense."   *Id*. at 27.   The *Anderson* Court first cited *Baldwin v. Franks*, noting that "[t]he elements of [seditious conspiracy] are definitely stated [in that case.]"   *Id*. at 25.   The *Anderson* Court, following *Baldwin*, opined:

> There must, therefore, be found in the [seditious conspiracy] count a charge
> that *the purpose of the conspiracy* was the exertion of force *against those
> charged with the duty of executing the laws of the United States*, or the
> language used in the count must be such that from it the inference
> reasonably follows that that was the purpose and object of the conspiracy[.]

*Id.* at 26 (emphasis added).   While the indictment in *Anderson* averred the use of force, it

was defective as the alleged force "was to be exerted, *not against those whose duty it*

*should be to execute the laws, and while attempting to do so*, but its application was to be

made against . . . commercial activities . . . by lawless acts during strikes for the purpose

of . . . destruction of the present civil compact."   *Id.* at 26-27 (emphasis added).

The Seventh Circuit, likewise following *Baldwin*, held that the crime of seditious

conspiracy requires that the *purpose* of the conspiracy must be to forcibly obstruct *a*

*person authorized to execute the challenged law*:

> Section 6 [, the seditious conspiracy statute,] should not be enlarged by
> construction. Its prima facie meaning condemns force *only* when a
> conspiracy exists to use it against some person *who has authority to execute*
> *and who is immediately engaged in executing a law of the United States*.

*Haywood v. United States*, 268 F. 795, 800 (7th Cir. 1920) (emphasis added).

Accordingly, the Court ruled that the actions of a socialist group's members in

encouraging worker strikes in war plants and draft avoidance, as well as other anti-war

activities, did not constitute a seditious conspiracy to stop the "execution of any law of

the United States."   *Id.* at 799-800.

To adequately plead a seditious conspiracy pursuant to the elements set forth in

*Baldwin*, the Government must allege, *inter alia*, that the *Rhodes* defendants' purpose in

conspiring together was to use force against a person "who has authority to execute and

who is immediately engaged in executing a law of the United States."   *Id.*

14

C.  **Members of Congress do not "execute the laws" of the United States.**

Count 1 is defective because, *inter alia*, it fails to identify, as the target of the conspiracy, an *individual* authorized to *execute* the *election laws*.   Instead, the Indictment alleges that the *purpose* of the *Rhodes* defendants' seditious conspiracy was to "oppose the lawful transfer of presidential power by force[.]"   (ECF 1, ¶16).   In other words, the Government's Indictment asserts that the *Rhodes* defendants acted for the purpose of "setting the laws themselves at defiance," *Baldwin*, 120 U.S. at 693, which is not a seditious conspiracy.   On this ground alone Count 1 should be dismissed for failure to state an offense.

Second, assuming that Members of Congress can be divined from the Indictment's language as the human targets of the seditious conspiracy, Count 1 still must be dismissed because the Supreme Court has made clear that Members of Congress *are constitutionally prohibited from executing the law*.   *Bowsher v. Synar*, 478 U.S. 714, 726-27 (1986).   In *Bowsher*, the Supreme Court struck down the Gramm-Rudman-Hollings Act under which Congress delegated to the Comptroller General significant budget cutting authority but, controversially, reserved its right to remove this officer.   *Id.* at 725-26.   The Court observed that the Comptroller General was essentially under the control of Congress, but was simultaneously empowered to execute the laws, which intruded on the executive branch's authority in violation of the separation of powers doctrine.   *Id.* 726-27.   The Court declared:

> To permit the execution of the laws to be vested in an officer answerable
> only to Congress would, in practical terms, reserve in Congress control
> over the execution of the laws. . . .  *The structure of the Constitution does
> not permit Congress to execute the laws*; it follows that Congress cannot
> grant to an officer under its control *what it does not possess*.

*Id*. (emphasis added).  *See also Myers v. United States*, 272 U.S. 52, 138-39 (1926) (listing the three exceptions in the Constitution, i.e., treaty-making, confirming nominees, and granting letters of marque and reprisal, where Congress shares executive authority with the President).

As used in § 2384, the phrase "execution of any law of the United States" was obviously intended to apply to actions by the President and those acting under his authority.   The Founding Fathers "clearly understood that the executive power was the power to execute laws."   Saikrishna Prakash, *Article II: The Essential Meaning of Executive Power*, U. Ill. L. Rev. 701, 716 (2003).   Simply stated:   "[T]he Constitution vests the executive power only in the president's hands, [and] those who execute the law should be viewed as receiving their authority to execute from the president."   *Id*. at 720. The *Rhodes* defendants did not engage in a seditious conspiracy, as the target of their alleged conspiracy, Members of Congress, had no authority vis-a-vis the "execution of any law of the United States."   Accordingly, it was legally impossible for the *Rhodes* defendants to have forcibly "prevented, hindered or delayed" Congress's "execution" of the election laws on J6.   Seditious conspiracy, as *Baldwin* demands, requires proof that the defendants conspired for the *purpose* of forcibly challenging *the authority of someone*

16

*duly authorized to execute the law being challenged*.   The Indictment makes no such allegation, requiring dismissal of Count 1.

### D. **Congress, in certifying the Electoral College, was not "executing a law."**

That Members of Congress are constitutionally prohibited from executing the laws is clear.   Equally clear is that the actions of Congress in relation to the Electoral College certification on J6 were not synonymous with "executing a law of the United States."   In fact, the Supreme Court has specifically held that Congress's alleged "execution" of the Electoral College certification via the 12th Amendment is manifestly not an executive action at all.

In *Buckley v. Valeo*, the Supreme Court struck down portions of the Federal Elections Campaign Act of 1971, including a provision that gave Congress the power to directly appoint commissioners to the FEC.   *Buckley v. Valeo*, 424 U.S. 1, 134 (1976). Emphasizing that the FEC's mandate included the power to execute laws, opponents argued that Congress's appointment of commissioners violated the separation of powers principle embodied in the Appointments Clause of Article II of the Constitution.   *Id*. at 124-26.   The Court struck down this provision, ruling that the Commission, as constituted with congressional appointees, could not constitutionally exercise its authority to execute the law.   *Id*. at 140-42.

In so doing, the *Buckley* Court held that the Electoral College certification process under the 12th Amendment was not executive but, rather, "judicial in character":

Appellees also *rely on the Twelfth Amendment to the Constitution* insofar as the authority of the Commission to regulate practices in connection with the Presidential election is concerned. This Amendment provides that certificates of the votes of the electors be "sealed [and] directed to the President of the Senate," and that the "President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted." The method by which Congress resolved the celebrated disputed Hayes-Tilden election of 1876, reflected in 19 Stat. 227, *supports the conclusion that Congress viewed this Amendment as conferring upon its two Houses the same sort of power "judicial in character,"* Barry v. United States ex rel. Cunningham, supra, at 613, as was conferred upon each House by Art. I, § 5, with respect to elections of its own members.

*Id*. at 133-34 (emphasis added).   Importantly, the 19th century statute referenced, 19 Stat. 227, which the *Buckley* Court found "supports the conclusion that Congress viewed [the 12th Amendment] as conferring [to it]. . . 'judicial in character' [power]," has been codified as 3 U.S.C. § 15 *et. seq*.   In other words, the Supreme Court held that the *very statute* that the *Rhodes* defendants, per the Indictment, allegedly conspired to obstruct the "execution" of, i.e., Title 3, Section 15, was itself definitive proof that the Electoral College certification process set forth in the 12th Amendment was a "judicial in character" function of the Congress.   Accordingly, Congress clearly was not engaged in the "execution of any law of the United States" when it was conducting the Electoral College certification.

The Indictment fails to allege a seditious conspiracy, as it does not allege that the *Rhodes* defendants' conspiratorial *purpose* was to obstruct those *with the duty of*

*executing the laws* of the United States *while they were executing a law*.[10]   The

Indictment's *raison d'etre* is clear:   the *Rhodes* defendants conspired to forcibly obstruct

Congress's "execution" of the 12th Amendment and 3 U.S.C § 15 by interrupting the

certification of the Electoral College.   Members of Congress, however, are

constitutionally prohibited from executing federal law.   Additionally, as *Buckley* makes

clear, the Electoral College certification process pursuant to 3 U.S.C. § 15 and the 12th

Amendment is not the execution of a law.   Accordingly, on J6, Congress was not

"executing" election laws but, rather, complying with its non-executive constitutional

obligations.   Accordingly, Count 1 must be dismissed.


## II.   <u>Counts 2 & 3 Fail to State Offenses</u>.

     The *Rhodes* defendants are charged in Counts 2 & 3 of the Indictment with

conspiracy to obstruct an official proceeding, 18 U.S.C. § 1512(k),[11]  and the substantive

offense of obstruction of an official proceeding and aiding and abetting in violation of 18

U.S.C. §§ 1512(c)(2), 2.   (ECF 1, ¶¶135-38).   The Indictment's central claim is that the

---

[10]  The Capitol Police and other police departments, it should be noted, have no authority
to "execute" the 12th Amendment and 3 U.S.C. § 15.

[11]  In the original set of indictments from *United States v. Caldwell*, Caldwell and others
were charged with violating 18 U.S.C. § 371, conspiracy to violate 18 U.S.C. § 1512(c),
and *not* 18 U.S.C. § 1512(k), conspiracy to violate § 1512(c)(2), which is charged in the
instant Indictment.   *See Caldwell*, (ECF 558).   For the purpose of protecting the record,
Caldwell makes clear that all statutory and constitutional arguments previously made in
relation to Count 1 of the indictment in *Caldwell* as to § 371, which were rejected by the
Court, are reasserted in the instant motion to dismiss as to Count 2, § 1512(k).

*Rhodes* defendants conspired to, and *physically* obstructed, the certification of the Electoral College by breaching the Capitol Building.    *Id.* (re-alleging ¶¶1-13, 18-134). The Indictment does not allege that the *Rhodes* defendants' actions were targeted at tangible evidence spoliation which, as explained *infra*, is an essential element of § 1512(c)(2).    Accordingly, Counts 2 & 3 must be dismissed.[12]

**A.    <u>Congress used the word "otherwise" to connect subsections (c)(1) and (c)(2).</u>**

A plain reading of § 1512(c) confirms that this section was intended to exclusively cover obstructive acts aimed at tangible evidence spoliation.    As noted in previous filings in *United States v. Caldwell*, the statute's title and context clearly suggests that protecting the adversarial process by outlawing obstructive acts aimed at tangible evidence was Congress's goal.    The issue is whether subsection (c)(2), which was added to § 1512's original language, was intended to be a separate and distinct crime or, alternatively, that subsection (c)(2) is inextricably tied to subsection (c)(1), thus limiting

---

[12] The argument Caldwell presents is similar to that which was made in a Motion to Reconsider (ECF 566) the Court's ruling in *United States v. Caldwell*, (ECF 558), on the § 1512 issue.    Caldwell reasserts his "plain meaning" argument for three reasons.    First, it was unclear from the Court's previous ruling (ECF 596) on Caldwell's Motion to Reconsider whether the arguments contained therein were preserved for appeal.    Second, as the Government did not address the arguments set forth in his Motion to Reconsider, (ECF 573), Caldwell again offers the Government an opportunity to address the merits of his "plain meaning" argument, specifically on the issue of whether the word "otherwise," as used in § 1512, is a "conjunctive adverb."    Finally, one Judge of this District has recently granted dismissal in a J6 case based upon his view that § 1512(c)(2) is ambiguous as to whether the statute applies to the conduct of defendants on J6.    *United States v. Miller*, 1:21-cr-119-CJN (Mar. 7, 2022) (ECF 72).

the former subsection's reach to obstructive acts similar to those listed in subsection

(c)(1).

The most obvious contextual evidence that Congress intended subsection (c)(1)

and subsection (c)(2) to be interconnected is § 1512's repeated use of the disjunctive "or"

throughout other areas of the statute as a way of demarcating plainly separate and

independent conduct.   In fact, the word "or" is used *nine* times in 18 U.S.C. § 1512 to

create *twenty* separate and independent methods of obstructing justice.   For example,

"or" is used in § 1512(a)(1) to demarcate three separate methods of obstructing justice by

murder or attempted murder.[13]   Similarly, "or" twice appears in § 1512(a)(2), effectively

demarcating seven distinct methods of obstruction through threats or physical force.[14]   In

---

[13] **(a)(1)** Whoever kills or attempts to kill another person, with intent to—
  **(A)** prevent the attendance or testimony of any person in an official proceeding;
  **(B)** prevent the production of a record, document, or other object, in an official proceeding; *or*
  **(C)** prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings[.]
18 U.S.C. § 1512(a)(1)(A)-(C) (emphasis added).
[14] **(2)** Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to—
  **(A)** influence, delay, or prevent the testimony of any person in an official proceeding;
  **(B)** cause or induce any person to—
  **(i)** withhold testimony, or withhold a record, document, or other object, from an official proceeding;
  **(ii)** alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding;

stark contrast, Congress, unlike in twenty surrounding places, inserted "otherwise"

between subsections (c)(1) and (c)(2) of § 1512(c), which states:

> **(c)** Whoever corruptly—
> **(1)** alters, destroys, mutilates, or conceals a record, document, or other
> object, or attempts to do so, with the intent to impair the object's integrity
> or availability for use in an official proceeding; or
> **(2)** *otherwise* obstructs, influences, or impedes any official proceeding, or
> attempts to do so, shall be fined under this title or imprisoned not more than
> 20 years, or both.

18 U.S.C. § 1512(c) (emphasis added).

As the Court can see, when Congress set out to create plainly separate and

independent acts of obstruction of justice, it did so twenty times by carefully inserting the

word "or" (without the word "otherwise") between sections.   Accordingly, the Achilles'

heel of the Court's interpretation of § 1512(c) in *Caldwell* is, respectfully:   Why would

Congress, after using "or" to unambiguously demarcate twenty plainly separate and

independent methods of obstructing justice, insert the word "otherwise" between

subsections (c)(1) and (c)(2) for the exact same purpose?   In other words, Congress

---

> **(iii)** evade legal process summoning that person to appear as a witness, or
> to produce a record, document, or other object, in an official proceeding; ***or***
> **(iv)** be absent from an official proceeding to which that person has been
> summoned by legal process; ***or***
> **(C)** hinder, delay, or prevent the communication to a law enforcement
> officer or judge of the United States of information relating to the
> commission or possible commission of a Federal offense or a violation of
> conditions of probation, supervised release, parole, or release pending
> judicial proceedings;
> shall be punished as provided in paragraph (3).

18 U.S.C. § 1512(a)(2)(A)-(C) (emphasis added).

could have "underscored" that (c)(1) and (c)(2) involve different obstructive conduct by *omitting* "otherwise" from the statute altogether.   Logically, therefore, "otherwise" must have been intended by Congress to have a purpose different than, as the Court found, (*Caldwell* (ECF 558 at 26-27)), underscoring disjunction between the subsections.

      To accurately read the statute, the Court should consider the language of § 1512(c) *sans* "otherwise":

> **(1)** [Whoever corruptly] alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
> **(2)** [Whoever corruptly] obstructs, influences, or impedes any official proceeding, or attempts to do so[.]

Without "otherwise," (c)(1) and (c)(2) are disjunctive, independent clauses, clearly delineate separate conduct, and make perfect sense on their own.   In other words, *without* using the word "otherwise," (c)(1) and (c)(2) describe plainly separate and independent conduct consistent with the Court's interpretation of the statute.   Stated another way, as "or" (without "otherwise") 100% *effectively disjoins* the clauses, "otherwise" could *not* have been included in the statute for the purpose of underscoring disjunction. Why would Congress delineate--twenty times--separate types of obstructive conduct by using "or," but then insert the word "otherwise" in § 1512(c) for the same purpose?   Contrary to the Court's holding, respectfully, "otherwise" in § 1512(c)(2) must have been inserted for a reason *other than* disjunction.

B. __The Court, Respectfully, Misapplied the Dictionary Definition of__
   __"otherwise.__"

The Court's opinion in *Caldwell* referenced multiple dictionaries in reaching its conclusion that "otherwise" in (c)(2) refers to "in a different way or manner" or in "another way." (*Caldwell* (ECF 558 at 26)).   The Court observed that "otherwise" acts as an "adverb" within § 1512(c).   *Id.*   Accordingly, the Court substituted the words "in a different manner" for "otherwise," finding that "the acts prohibited by (c)(1) are 'different' from those prohibited by (c)(2)."   *Id*. At 27.   Respectfully, the Court applied the wrong grammatical analysis to the term "otherwise."

C. __Conjunction Junction, What's Your Function__?

The Court's finding that "otherwise" is used as an "adverb" in § 1512(c) is technically correct but, respectfully, flawed.   There are six types of adverbs in the English language:   adverbs of time, manner, place, degree, frequency, and conjunction.[15] The first five types are similar in nature and used to modify (typically) verbs *within* their clauses or sentences.[16]   The sixth type of adverb is the "conjunctive adverb," which "is an adverb that acts like a conjunction."[17]   In § 1512(c), "otherwise" operates as a conjunctive adverb, which, as will be explained *infra*, should cause the Court to reconsider its prior holding and grant the *Rhodes* defendants' motion to dismiss.

---

[15] https://www.thesaurus.com/e/grammar/types-of-adverbs/ (online thesaurus).
[16] *Id.*
[17] *Id.*   A "conjunctive adverb" is sometimes called an "adverbial conjunction."

24

That "otherwise" in § 1512(c)(2) is a conjunctive adverb is clear.   According to a

well-respected dictionary:

> When used to connect two related clauses, *otherwise* is usually classified as
> a conjunctive adverb, which by grammatical tradition should be preceded
> either by a semicolon or by a period.[18]

Notably, "otherwise" appears in § 1512(c)(2) after a semicolon, a blaring grammatical

siren that it's indeed a conjunctive adverb.[19]   Additionally, "otherwise" is interspersed

between two independent clauses, another classic tip-off that it is functioning as a

conjunctive adverb.[20]   Additionally, as the Court noted, "otherwise" is an adverb that

"*connects* the two provisions[.]"   (*Caldwell* (ECF 558 at 27, fn. 6)) (emphasis added).

Just as compelling, "otherwise," which the Court and the *Rhodes* defendants both agree is

used as an adverb, does *not* modify any words that appear *after* it in subsection (c)(2).

An adverb's grammatical duty is to act as a "modifier," i.e., "add information to another

---

[18] AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th Ed. 2020),
https://www.ahdictionary.com/word/search.html?q=otherwise, (Usage note) (emphasis
original).

[19] William & Mary Writing Resource Center,
wm.edu/as/wrc/newresources/handouts/the-semicolon.pdf (listing "otherwise" as a
common conjunctive adverb placed after a semicolon).

[20] *Id.*   *See also* Jennifer Gunner, M.Ed. (Education),
https://grammar.yourdictionary.com/parts-of-speech/adverbs/con-adverb.html
("Conjunctive adverbs can follow a semicolon or a period and typically have a comma
after them.").   While the modern MLA style of writing suggests that a comma should be
placed after a conjunctive adverb, this grammatical preference does not necessarily apply
to "otherwise," which is one of the few conjunctive adverbs that doesn't end with –ly.
*See*, *e.g.*. AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th Ed. 2021),
https://www.ahdictionary.com/word/search.html?q=otherwise (usage note regarding
"otherwise") ("When introducing a new clause, **otherwise** is *often* followed by a
comma.") (emphasis added).

element in the sentence."[21]   "Otherwise" in subsection (c)(2), by contrast, *does not add information* about the words "obstructs, influences, or impedes," which logically means that, by process of elimination, "otherwise" in (c)(2) acts as a conjunctive adverb.

### D.   A "conjunctive adverb" conjoins and modifies two separate clauses.

Respectfully, the *Rhodes* defendants are not being grammatically nit-picky. Analyzing (correctly) the word "otherwise" as a conjunctive adverb substantially changes the calculus of interpreting § 1512(c).   The difference between "otherwise" the "adverb" and "otherwise" the "conjunctive adverb" is significant.   An "adverb" modifies a word within the clause it resides.   Conjunctive adverbs, by contrast, do not modify *adjacent* words; instead, these grammatical renegades *relate the entire adverbial clause back to the preceding clause*, thus modifying, in some respect, the first clause:

> Most of the time, adverbs are words that we use to modify verbs, adjectives, or other adverbs.   …   A conjunctive adverb *acts differently* than other adverbs by connecting independent clauses that can stand alone as sentences.   In this way *it is still acting as a modifier by using one clause to modify another*.[22]

---

[21] University of Ottawa Writing Center,
https://arts.uottawa.ca/writingcentre/en/hypergrammar/modifiers
[22] Dictionary.com (online dictionary and thesaurus),
https://www.thesaurus.com/e/grammar/conjunctive-adverbs/ (emphasis added).   See also Renee Banzhaf, M.Ed. in English Education, https://grammar.yourdictionary.com/parts-of-speech/adverbs/list-of-conjunctive-adverbs.html ("Conjunctive adverbs function as both conjunctions (by joining ideas) and as adverbs (by modifying parts of the sentence).");   Andrew Smith, Global Business Language Consultant, *We Speak Business*, https://www.we-speak-business.com/blog/conjunctive-adverbs ("The role of the conjunctive adverb is to turn the clause that it introduces into an adverbial modifier of the previous clause.").

A "conjunctive adverb" is "a word that modifies a whole previous statement."   Frederick

Crews, THE RANDOM HOUSE HANDBOOK 403 (6th ed. 1992).   A "conjunctive adverb . . .

brings together two complete thoughts like a conjunction[] [and] use[s] the second clause

to modify the first clause like an adverb."[23]   In other words, contrary to the Court's

holding, "otherwise" was not intended to signify disjunction, i.e., "to underscore that the

acts prohibited by (c)(1) are 'different' from those prohibited by (c)(2)."   (*Caldwell*

(ECF 58 at 27, fn. 6)).   *Au contraire*, respectfully, the use of "otherwise" as a

conjunctive[24] adverb is proof positive that Congress intended to inextricably tie these

clauses together with the adverbial clause ("obstructs, influences, or impedes") modifying

the opening clause.

        The Court and the *Rhodes* defendants agree that, in § 1512(c), "otherwise" is used

as an "adverb" that connects subsections (c)(1) and (c)(2).   A flaw in the Court's

reasoning, respectfully, is that when used as an "adverb" to "connect" two clauses,

"otherwise" is, by definition, a *conjunctive* adverb, which means that the "otherwise," or

adverbial, clause is *not* modified itself but, instead, modifies the opening clause.   In

other words, (c)(2)'s "obstructs, influences, or impedes" *modifies* language in subsection

(c)(1), and is manifestly not an independent clause.

---

[23]  Jennifer Gunner, M.Ed. (Education), *YourDictionary.com*,
https://grammar.yourdictionary.com/parts-of-speech/adverbs/con-adverb.html
[24]  In Latin, "conjunction" literally translates to "join together."

**E.  So what did Congress intend?**

By adding the conjunctive adverb "otherwise" to § 1512(c), Congress intended three things.   First, Congress, in contradistinction to twenty other portions of 18 U.S.C. § 1512, created a connection between (c)(1) and (c)(2).   Second and related, Congress intended the adverbial clause, i.e., "obstructs, influences, or impedes," to modify in some way the language in the opening clause.   Third "otherwise" was obviously intended by Congress to widen the net beyond the acts of obstruction enumerated in (c)(1).   *Collins Dictionary*, in one paragraph, illustrates how "otherwise" operates in § 1512(c)(2):

> **Otherwise--**
> ADVERB [ADV before v]
> You use **otherwise** to indicate that other ways of doing something are possible in addition to the way already mentioned.[25]

To paraphrase *Collins Dictionary*:   Congress used "otherwise" to indicate that other ways of "obstruct[ing]," "influenc[ing]," or "imped[ing]" an official proceeding by tangible evidence spoliation are possible in addition to the ways already mentioned, i.e., "alter[ing], destroy[ing], mutilat[ing], or conceal[ing]" documents and records. Accordingly, a fair reading of the statute is:   "Whoever corruptly alters, destroys, mutilates, or conceals a record, document, or other object with the intent to impair the object's integrity or availability for use in an official proceeding, or in other ways

---

[25] COLLINS DICTIONARY (online version) (English learner's edition), https://www.collinsdictionary.com/us/dictionary/english/otherwise.

engages in tangible evidence spoliation not specifically enumerated," is guilty under §
1512(c).

Such a reading of § 1512(c) takes into account that the term "otherwise" does two
things:   it creates a connection between (c)(1) and (c)(2), while it expands the reach of
the verbs of proscription in subsection (c)(1).   Congress's intent was to proscribe
obstructive conduct regarding the integrity and production of documents and objects that
might otherwise slip through the cracks without a broad residual clause.   Some examples
include:

1) A person feigns a COVID infection and quarantines himself to avoid producing
   documents under a time-sensitive grand jury subpoena.

2) A corporate executive, knowing that he could be indicted for fraud, hands over to
   the Government, in response to a subpoena, three tractor-trailers full of non-
   germane documents, knowing that the smoking-gun document is buried at the
   bottom, ensuring that prosecutors miss the statute of limitations.

3) A person under grand jury investigation with the IRS, knowing that a windstorm is
   about to hit his residence, sets all of his incriminating documents on a table next to
   an open window, where they proceed to be blown away, making them unavailable
   for an official proceeding.

4) A lawyer files multiple frivolous challenges to a court order or subpoena to avoid
   document production for use in an official proceeding.

5) A person, knowing that their iPhone contains incriminating texts messages, deletes
   selected, non-incriminating texts, which changes the context of other texts
   messages, deliberately making them look less incriminating to the grand jury.

In the above scenarios, the wrong-doers likely did not "alter[], destroy[], mutilate[], or
conceal[]" a record as enumerated in subsection (c)(1), but their conduct could still be
prosecuted under § 1512(c)(2).   Congress's intent was to criminalize obstructive conduct

technically not captured or anticipated under (c)(1), not to hand prosecutors a sweeping, over-lapping obstruction of justice statute equipped with a 20-year maximum penalty sledgehammer.

As the Supreme Court has emphasized "over and over," when "expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *U.S. Nat'l Bank v. Independent Ins. Agents of Amer.*, 508 U.S. 439, 455 (1993) (internal citations omitted). The current version of § 1512(c) was enacted as part of Sarbanes-Oxley, which Congress intended to improve the accuracy of corporate disclosures by penalizing those who obstruct justice "by impairing the integrity or availability of records, documents, and other tangible objects." *United States v. Hutcherson*, No. 6:05CR00039, 2006 U.S. Dist. LEXIS 6652, at *6-7 (W.D. Va. Feb. 3, 2006).   Accordingly, "the amended § 1512(c) created a specific subsection dealing with tampering with tangible evidence, in what was otherwise a statute that previously dealt only with tampering of persons." *Id*.   Section 1512 was not intended to create two separate crimes but, instead, was "meant to criminalize difficult to enumerate conduct that would otherwise slip past Section 1512(c)(1)'s specific proscription." *Id*.

Respectfully, the Court should reconsider its ruling in *Caldwell* and grant the *Rhodes* defendants' motion to dismiss as to Counts 2 & 3 of the Indictment, as the defendants' alleged criminal conduct on J6 had no connection to tangible evidence spoliation.

30

### III.   Count 4 Must be Dismissed, as Members of Congress are not "officer[s] of the United States" Under 18 U.S.C. § 372.

Count 4 of the Indictment alleges that the *Rhodes* defendants violated 18 U.S.C. § 372.   (ECF 1, ¶¶ 139-40).   Specifically, the Government charges that the *Rhodes* defendants

> did knowingly conspire and agree together and with each other to prevent by force, intimidation, and threat, any person, *that is, Members of the United States Congress*, from discharging any duties of any office, trust, and place of confidence under the United States, and to induce by force, intimidation, and threat, any officer of the United States, *that is, Members of the United States Congress*, to leave the place where their duties as officers were required to be performed.

*Id*., ¶ 140 (emphasis added).   Title 18 U.S.C. § 372, in turn, provides:

> If two or more persons in any State, Territory, Possession, or District conspire to prevent, by force, intimidation, or threat, *any person from accepting or holding any office, trust, or place of confidence under the United States*, or from discharging any duties thereof, or to induce by like means *any officer of the United States* to leave the place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties, each of such persons shall be fined under this title or imprisoned not more than six years, or both.

18 U.S.C § 372 (emphasis added).   Count 4, notably, alleges that "Members of the United States Congress" were the individuals targeted by the *Rhodes* defendants.   Count

31

4 must be dismissed, as Members of Congress do not hold "any office, trust, or place of confidence" and are not "officer[s] of the United States" within the meaning of § 372.

A. **As used in § 372, "officers of the United States" are appointees, not elected officials**.

While there is a dearth of case law directly addressing the issue of whether a Member of Congress is an "officer of the United States" under § 372, the United States Supreme Court has made clear for more than 150 years that this term, as used in federal statutes, mirrors its usage in Article II, § 2, cl. 2 of the Constitution (the Appointments Clause).   Because Members of Congress are not "officer[s] of the United States" as that term is used in the Appointments Clause, *see infra*, they likewise are not "officers" for purposes of § 372.

In *United States v. Hartwell*, the Supreme Court set forth the common 19th century understanding of the terms "office" and "officer" as used in federal criminal statutes. The defendant, a Treasury Department clerk, was indicted under a federal statute punishing those who embezzled, including "officers and other persons charged by [The General Appropriation Act] with the safe-keeping . . . [of] the public money[.]"   *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1868).   The defendant argued that he was not an "officer" within the meaning of the statute, as he was not "appointed" by the President.   *Id*. at 392-93.   The Court ruled against the defendant, but first provided the Court's understanding of the term "office":   "[A]n office is a public station, or employment, *conferred by the appointment* of government."   *Id*. at 393 (emphasis

added).    Implicitly, the Court held that the term "officer" in the statute was intended by

Congress to have the same meaning as in the Appointments Clause.    *Id*. at 394, n. 9.

Finding that the (appointed) Secretary of the Treasury was, in turn, authorized to appoint

clerks in his department, the Court reasoned that the defendant was an "officer" under the

Appointments Clause and, thus, an "officer" within the meaning of the statute.    *Id*.

A decade later in *United States v. Germaine*, the defendant, a surgeon hired by the

Commissioner of Pensions, had been indicted for extortion while serving as, allegedly, an

"officer of the United States."    *United States v. Germaine*, 99 U.S. 508, 509 (1878)

(*citing* 4 Stat. 118, § 12 (1825)).    Arguing for the indictment's dismissal, the defendant

"insist[ed] that art. 2, sect. 2, of the Constitution, prescribing how officers of the United

States shall be appointed, [was] decisive of the case before" the Court.    *Id*. at 509.    The

Court agreed, holding that the defendant was not an "officer of the United States" within

the meaning of the extortion statute.    *Id*. at 512.    The Court explained that, absent

unambiguous language to the contrary, the term "officer of the United States," when used

in criminal statutes, is limited to individuals appointed pursuant to the Appointments

Clause:

> It is, therefore, not to be supposed that Congress, when enacting a criminal
> law for the punishment of *officers of the United States*, intended to punish
> any one not appointed [under the Appointments Clause]. *If the punishment*
> *were designed for others than officers as defined by the Constitution, words*
> *to that effect would be used, as servant, agent, person in the service or*
> *employment of the government*[.]

*Id*. at 509-10 (emphasis added).    *Accord United States v. Smith*, 124 U.S. 525, 531-32

(1888) ("A person in the service of the government who does not derive his position from [the Appointments Clause] is not an officer of the United States in the sense of the Constitution."); *United States v. Mouat*, 124 U.S. 303, 307 (1888) ("Unless a person in the service of the Government . . . holds his place by virtue of [the Appointments Clause], he is not, strictly speaking, an officer of the United States.").

Accordingly, when used in federal criminal statutes, the terms "office," "officer," and "officer of the United States," absent unambiguous language to the contrary, refer to government appointees. As the Supreme Court, summarizing the aforementioned cases in 1925, observed:  "It is quite true that the words 'officer of the United States,' when employed in the statutes of the United States, *is to be taken usually to have the limited constitutional meaning*." *Steele v. United States*, 267 U.S. 505, 507 (1925) (emphasis added).

### B. <u>Members of Congress are not "officers" under the Appointments Clause.</u>

Members of Congress are not "officers" under the Appointments Clause and, accordingly, are not "officers" under § 372. As the Supreme Court recently noted: "The people do not vote for the 'Officers of the United States.' U.S. CONST. ART. II, § 2, cl. 2." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 551 U.S. 477, 498 (2010) (*quoting* The Federalist No. 72, p. 487 (J. Cooke ed. 1961) (A. Hamilton)). "[N]o person who is an officer of the United States may serve as a Member of the Congress." *Bowsher*, 478 U.S. at 722. As confirmed by the Supreme Court, Members of Congress are not "officers" under the Appointments Clause and, as such, they are not

"officers" for purposes of § 372.

**C.** **Members of Congress do not accept or hold "offices, trusts, or places of confidence."**

Section 372 outlaws conspiracies aimed at "prevent[ing] any person from *accepting* or *holding* any office, trust, or place of confidence under the United States[.]" 18 U.S.C. § 372.   Members of Congress clearly do not hold an "office, trust, or place of confidence."   Most telling:   an "office, trust, or place of confidence" are stations held by those who *accepted* their positions.   Members of Congress do not "accept" their offices—they *assume* or *take* office.   A person "accepting" an "office, trust, or place of confidence," moreover, presupposes that someone *offered* that person the "office, trust, or place of confidence" they accepted.   Since these positions are "under the United States," the offeror of the jobs, logically, has authority to dole out government jobs, e.g. the President via the Appointments Clause.   Members of Congress, by contrast, run for their offices and are elected by the voters.   They do not "accept" government job "offers."   Accordingly, the phrase "office, trust, or place of confidence" in § 372 obviously does not include Members of Congress.

Congress's use of the word "accepting" shuts the door on any suggestion that § 372 was intended to cover elected officials.   Additionally, Congress's use of the phrase "any person . . . holding any office . . . under the United States" in § 372 further proves that Members of Congress are not covered by the statute's language.   This language, tellingly, appears to have been *lifted* from the Constitution's "Ineligibility Clause,"

wherein Members of Congress are *prohibited* from simultaneously holding offices: "[N]o *Person holding any Office under the United States*, shall be a Member of either House during his Continuance in Office." U.S. CONST., ART. I, § 6, cl. 2 (emphasis added). It is beyond belief that Congress intended to include itself in § 372 by using verbatim language from the Constitution's Ineligibility Clause, which bans Members of Congress from holding offices.

Consistent with Supreme Court precedent in *Hartwell*, *Germaine*, *Smith*, *Mouat*, and *Steele*, the terms "office" and "officer of the United States" are presumed to have, absent unambiguous language to the contrary, their "constitutional meaning." Congress clearly was sticking to the "constitutional meaning" when they drafted § 372. First, by the statute's plain language, to secure an "office, trust, or place of confidence," a person must *accept* that position, confirming that these stations are appointed, not elected, positions. Second, § 372's protections apply to "a person . . . holding any office . . . under the United States"; by comparison, the Constitution, *in practically identical language*, states that "no Person holding any Office under the United States" shall be a Member of Congress. U.S. CONST., ART. I, § 6, cl. 2. Accordingly, the stations listed in § 372 unambiguously exclude Congress.

D. **Members of Congress do not hold places of "trust" and "confidence."**

Historical context is important to understanding the phrase "office, trust, or place of confidence." The obvious question: What prompted Congress to enact a statute aimed at protecting government officials who, apparently, were being frightened away

from their posts?   As noted *supra*, Congress, responding to Southern secession in 1861,

passed a sweeping statute prohibiting conspiracies, including punishing those who,

> by force, or intimidation, or threat [   ] prevent any person from accepting
> or holding any office, or trust, or place of confidence, under the United
> States . . .[.]

12 Stat. 284 (1861).   President Lincoln, just before passage of the 1861 Act, told

Congress that "[w]ithin [the southern] States all the forts, arsenals, dockyards, custom-

houses, and the like, including movable and stationary property in and about them, had

been seized and were held in open hostility to this Government."[26]   Accordingly,

historical context suggests that the terms "office, trust, or place of confidence" relate to

military and civilian officers, who Congress knew were literally being ambushed away

from their posts by Confederate forces and sympathizers.

The terms "office, trust, or place of confidence" are not opaque.   The phrase

unambiguously refers to presidential appointees, i.e., military officers, executive branch

officials, and federal judges.   In fact, the terms "office," "trust," and "confidence" are

used in every *commission* signed by the President in relation to officers appointed

pursuant to the Appointments Clause.   For example, military officers receive a

commission stating that the President has "trust and confidence" in their abilities to

"discharge the duties of"—*another phrase used in § 372*-- their "office":

> Know Ye that, reposing special *trust and confidence* in the patriotism,
> valor, fidelity and abilities of . . ., I [the President] do appoint [John Doe]
> [an Ensign] in the Navy to rank as such[.] . . .   This Officer will therefore

---

[26] *See*, *supra*, note 3.

carefully and diligently *discharge the duties of the office* to which appointed[.]

https://www.expressmilitary.com/navy-dd-1.htm. (emphasis added).   Postmasters in the

19th century received similarly-worded commissions.[27]   Federal judges, such as the

esteemed Honorable E. Barrett Prettyman, receive a commission noting the President's

"trust and confidence" in their ability to handle their "office."[28]   The wording of

Presidential commissions remains virtually unchanged since America's founding.[29]

The phrase "office, trust, or place of confidence" in § 372 refers, accordingly, to

the ubiquitous *commissions* that have been issued since the founding to "officers of the

United States" by the President.   Presidential commissions of "trust and confidence" are

issued to "officers" pursuant to the Commissions Clause of the Constitution.   Const. Art.

II, § 3, cl. 4 ("[The President] shall commission all the officers of the United States.").

A Member of Congress does *not* receive a commission because he or she, unlike federal

judges, executive branch appointees, and military officers, is not an "officer of the United

States" and, hence, does not hold an "office, trust, or place confidence."

---

[27] *See*, *e.g*., *Embry v. United States*, 100 U.S. 680, 683 (1879) (reprinting language for a Postmaster commission: "Know ye, that, reposing special trust and confidence in the integrity . . . of Bowling Embry, I have . . . appoint[ed] him deputy postmaster at Nashville . . . to execute . . . the duties of that office[.]").
[28] https://dcchs.org/wp-content/uploads/2019/03/HarryTrumanLarge.jpg
[29] R. Swain & A. Pierce, *The Armed Forces Officer*, Nat'l Defense U. Press (2017), https://ndupress.ndu.edu/Portals/68/Documents/Books/AFO/Armed-Forces-Officer.pdf.

E. **Constitutional provisions confirm that Members of Congress are not "officers."**

     Early constitutional provisions, moreover, confirm that Members of Congress do not hold an "office, trust, or place of confidence" within the meaning of § 372.   First, the Constitution makes clear that Members of Congress cannot simultaneously hold offices. *See* U.S. CONST., ART. I, § 6, cl. 2 ("no Person *holding any Office under the United States*[] shall be a Member of either House[.]").   Next, the Constitution's plain text demonstrates that Members of Congress do not hold an "office of trust":

> Each State shall appoint . . . a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: *but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States*, shall be appointed an Elector.

U.S. CONST. ART. II, § 1 (emphasis added).[30]   In fact, state constitutions in the Founder's generation invariably distinguished between elected officials and those who held "offices" or "places" of "trust."[31]   Accordingly, § 372's list of stations, i.e., "any office,

_____

[30] At common law, an "office of trust" or "office of profit" referred exclusively to employees of the executive and judiciary, not to legislators.   *See* Benjamin Cassidy, *You've Got Your Crook, I've Got Mine: Why the Disqualification Clause Doesn't Always Disqualify*, 32 Quinnipiac L. Rev. 209, 278-80 (2014).

[31] *See*, *e.g.*, DEL. CONST. of 1776, art. XXII ("Every person who shall be chosen a member of either house, or appointed to any office or place of trust . . . shall take [an] oath . . . ."); KY. CONST. of 1799, art. II, § 26 ("No person . . . whilst he holds or exercises any office of profit under this commonwealth, shall be eligible to the general assembly . . . ."); LA. CONST. of 1812, art. VI, § 14 ("No members of Congress, nor person holding or exercising any office of trust or profit under the United States . . . shall be eligible as a member of the general assembly of this State, or hold or exercise any office of trust or profit under the same."); MD. CONST. of 1776, art. II ("[N]o member of

trust, or place of confidence," refer to *appointed* positions, not elected officials.   The

Congress that passed § 372 understood that the phrase "office, trust, or place of

confidence" did not include them.

As the term "office," "officer," and "officer of the United States" are, under

binding precedent, presumed to have, absent unambiguous language to the contrary, their

"constitutional meaning," Members of Congress are not included in § 372.   *Steele*, 267

U.S. at 507 ("It is quite true that the words 'officer of the United States,' when employed

in the statutes of the United States, *is to be taken usually to have the limited*

*constitutional meaning*" under the Appointments Clause); *Cf. Lamar v. United States*,

241 U.S. 103, 112-13 (1916) (holding that a Member of Congress was an "officer" within

the meaning of Penal Statute § 32 because of that statute's "comprehensive terms,"

including the phrase "any officer of the Government," which evinced a congressional

intent to go beyond Appointments Clause "officers.").

### Conclusion

WHEREFORE, defendant Thomas E. Caldwell respectfully requests that this

---

Congress, or person holding any office of trust or profit under the United States, shall be
capable of having a seat in the general assembly . . . or holding any office of trust or
profit under this State . . . ."); MASS. CONST. of 1780, ch. VI, art. II ("[N]o person . . .
shall ever be admitted to hold a seat in the legislature, or any office of trust or importance
under the government of this commonwealth . . . ."); N.C. CONST. of 1776, art. XII
("[E]very person, who shall be chosen a member of the Senate or House of Commons, or
appointed to any office or place of trust . . . shall take an oath . . . [.]").

Honorable Court dismiss Counts 1-4 of the Indictment in this matter with prejudice.

Respectfully submitted:

_____/s/_____
David W. Fischer, Esq.
Federal Bar No. 023787
Law Offices of Fischer & Putzi, P.A.
Empire Towers, Suite 300
7310 Ritchie Highway
Glen Burnie, MD 21061
(410) 787-0826
Attorney for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of April, 2022, a copy of the foregoing Defendant Caldwell's Motion to Dismiss Counts 1,2,3 and 4 of the Indictment was electronically filed with the Clerk of the United States District Court using CM/ECF, with a notice of said filing to the following:

Counsel for the Government:          Office of the United States Attorney
                                     Kathryn Rakoczy, AUSA
                                     555 4th Street, NW
                                     Washington, DC 20001

_____/s/_____
David W. Fischer, Esq.