## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 22-mj-05032-DMF-1 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | January 20, 2022 |
| Edward Vallejo, | ) | **AMENDED** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |


**BEFORE:  THE HONORABLE JOHN Z. BOYLE, MAGISTRATE JUDGE**

### TRANSCRIPT OF PROCEEDINGS

### DETENTION HEARING

**APPEARANCES:**
For the Plaintiff:
    US DEPARTMENT OF JUSTICE
    By:  **Mr. Louis J. Manzo**
    1400 New York Avenue, NW
    Washington, D.C. 20005
    US DEPARTMENT OF JUSTICE FOR THE DISTRICT OF COLUMBIA
    By:  **Mr. Troy A. Edwards, Jr.**
    555 4th Street, NW
    Washington, D.C. 20001

For the Defendant:
    FEDERAL PUBLIC DEFENDERS OFFICE
    By:  **Ms. Debbie Jang**
    850 West Adams Street, Suite 201
    Phoenix, Arizona 85007

Transcriptionist:
Christine M. Coaly
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248
Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

1              **P R O C E E D I N G S**

2              THE COURT:  Thank you.  Please be seated.

3              COURTROOM DEPUTY:  We're on the record in case number

4    22-5032 MJ, the United States of America versus Edward Vallejo,

5    set before the Court for a detention hearing.

6              THE COURT:  On behalf of the government.

7              MR. MANZO:  Good afternoon, Your Honor.  Lou Manzo on

8    behalf of the United States.

9              MR. EDWARDS:  Troy Edwards on behalf of the United

10   States, Your Honor.

11             THE COURT:  All right.  Good afternoon to both of you.

12             MS. JANG:  Good afternoon, Your Honor.  Debbie Jang on

13   behalf of Edward T. Vallejo.  He appears on the telephone with

14   his consent.

15             THE COURT:  All right.  Good afternoon.

16             Mr. Vallejo, this is Judge Boyle.  Sir, can you hear

17   me?

18             THE DEFENDANT:  Yes, I can, Judge Boyle.

19             THE COURT:  Good.  I can hear you as well.

20             We're here for your detention hearing.  You have a

21   right to be here in person.  Today you're on the telephone.  I

22   assume you're in a quarantine of some kind otherwise we'd have

23   you on a video teleconference.

24             THE DEFENDANT:  That is correct.

25             THE COURT:  We need to have your permission to handle

1   this matter over the telephone, and I also need to make sure

2   you've talked with your attorney about that choice.  So first

3   I'll turn to your counsel.

4           Ms. Jang, did you speak to Mr. Vallejo about those

5   choices?

6           MS. JANG:  Yes, Your Honor, we did speak briefly, and

7   Mr. Vallejo does consent to appearing by telephone.

8           THE COURT:  Mr. Vallejo, your attorney indicates that

9   she's talked with you about this choice and you agree to handle

10  the matter today over the telephone.

11          Is all of that correct?

12          THE DEFENDANT:  That is all correct, sir.

13          THE COURT:  All right.  Next, regarding a detention

14  hearing, you certainly have a right to that hearing here in

15  Arizona.  I want to make sure you understand that, as the

16  government knows, any appeal of the order by either party must

17  go to the district court in the District of Columbia.  And so

18  you're entitled to one hearing, either here or in that

19  district.  You have elected to have your detention hearing here

20  in Arizona.

21          Is that what you wish to do?

22          THE DEFENDANT:  Yes, sir.

23          THE COURT:  Good.  We'll go ahead and proceed.

24          Now, the government has the burden of proof regarding

25  flight risk or danger.  The government's filed a memorandum.  I

```
1    did not see any other entries from either party after that
2    memorandum.
3              Ms. Jang, is that correct?
4              MS. JANG:  Yes, Your Honor.
5              THE COURT:  Okay.  So, Mr. Vallejo, the government's
6    attorney will speak first.  That's who you'll be hearing.  When
7    they're concluded, I'll have your attorney speak, and then I'll
8    go back and forth as many times as is needed.
9              If for any reason you cannot hear us or there is a
10   problem with the line, please interrupt us, let us know, and
11   we'll be glad to go back and repeat what we said.
12             Do you understand, Mr. Vallejo?
13             THE DEFENDANT:  I do.  Thank you.
14             THE COURT:  Okay.  You're welcome.
15             All right.  This will be the government's attorney
16   speaking.
17             Ms. Jang, you're welcome to sit or stand, it's up to
18   you.  I know -- I don't know how long the government will speak
19   so.
20             MS. JANG:  Okay.  I will go ahead and sit.  Thank you,
21   Your Honor.
22             THE COURT:  All right.  That's fine.  Thank you.
23             MR. MANZO:  Thank you, Your Honor.  Would you prefer
24   if we keep our mask on or off.
25             THE COURT:  I do.  Thank you.  Unless it -- if it's --
```

1    is it an issue for you?

2              MR. MANZO:  No.  I can proceed.

3              THE COURT:  Please go ahead.

4              MR. MANZO:  Your Honor, much of our evidence today is

5    laid out in the detention memo that we previously submitted.

6    We'll be brief, therefore, and are happy to answer any

7    questions that you have or respond to any new arguments

8    presented by the defense.

9              In short, we'd urge the Court to recognize the danger

10   that Mr. Vallejo presents to the United States, and to take his

11   words at face value.  This is not an individual who is staying

12   at home yelling at a television screen.  This is an individual

13   who on the very date that Congress was set to certify the

14   presidential election results, stood poised to transport an

15   arson of weapons into Washington, D.C., during an unprecedented

16   riot that delayed one of the most sacred hallmarks of our

17   democracy, the peaceful transition of power.

18             He's a key member of the conspiracy and provided the

19   fourth component in this seditious conspiracy.  The defendant's

20   own language, much of it outlined in the detention memo, shows

21   his intent to defy the laws of the United States and his

22   dangerousness.  As he drove across the country armed with

23   weapons, he requested the coordinates of an allied encampment

24   outside of D.C.  When he arrived in the D.C. area, in addition

25   to the actions which I'll turn to in a minute, he gave multiple

1    interviews.  His words foretold the violence that was about to

2    take over the Capitol.

3         In regard to the upcoming certification of the

4    Electoral College vote, Mr. Vallejo said:  The American people

5    are going to be told today that we have liberty and justice for

6    all or they're going to be told fuck you.  Okay?  And if

7    they're told fuck you, that's going to be a declaration of a

8    guerilla war.

9         He later continued regarding the election:  Because

10   I'm the mother fucker that's going to fix it for them if they

11   tell me today it's broken.  You know what I've been telling

12   people?  I've been telling people for years, I'm the guy that

13   everyone said, no, Ed, you can't shoot them yet.  It's too

14   soon.  No, Ed, you can't shoot the bastards yet.  It's too

15   soon.  Well, I've been telling them for about five or

16   six months ago, they quit telling me.

17        Think about these words, Your Honor.  The defendant is

18   declaring that if Congress, at all times acting lawfully,

19   certifies the Electoral College vote, that he'll be launching a

20   guerilla war against the United States.  Just as important,

21   he'll be doing the shooting himself.  He claims that everyone

22   who has previously told him to hold back from committing

23   violence is not doing that anymore.  Again, this is not a man

24   ranting at his TV, but a dedicated man who has traveled across

25   the country to stand tall with rifles, who is part of an

1    organized armed conspiracy.

2         On January 6th, as the remainder of the conspiracy

3    advanced on the Capitol and obstructed the Electoral College

4    vote, the defendant played his part back at the hotel.  He,

5    along with other individuals, guarded a stash of weapons and

6    stood ready for deployment.

7         THE COURT:  Let me ask you a few questions about that.

8         Your first statement was that he drove across the

9    country with weapons.  What evidence are you prepared to

10   present that he did, in fact, do that?  I did not see that.  In

11   the indictment at paragraph 69 there is a reference regarding

12   the second point that you made, but let's start with the first.

13        What evidence is there that he had firearms when he

14   drove from Arizona to D.C.?

15        MR. MANZO:  We have statements from two individuals

16   who were involved in the Arizona QRF in different ways, that

17   there were firearms present.

18        One of the other Arizona QRF members stated that we

19   are rifles -- or we have rifles in messages to Stewart Rhodes.

20        In addition to that, Stewart Rhodes said that they had

21   an armed QRF on standby.

22        In addition to that, there is circumstantial evidence,

23   right.

24        THE COURT:  I have that.  There is certainly

25   circumstantial evidence and statements of the QRF, and that's

1    well established, but actual, either eyewitness or other

2    evidence, let's go back to the room now.

3            There is the photograph on page 6 of your memo that

4    shows Mr. Vallejo and another individual rolling items into a

5    room.  You can't see because they're covered up.  The second

6    photograph appears to be some type of a longer item, which I

7    assume may have firearms in it.

8            How do we know there are firearms in that item that's

9    listed on page 6?

10           MR. MANZO:  Well, one of the individuals who he

11   traveled cross country with, who was another member of the

12   Arizona QRF, text message -- or sent a Signal message to

13   Stewart Rhodes in saying that, we have rifles, or we are

14   rifles.

15           So that, combined with a long, skinny shaped bag,

16   which is consistent.  And, again, circumstantially, there has

17   never been a guerilla war that I know of that didn't have

18   weapons involved.  And a QRF is, by its nature, an armed force.

19   And then on top of that Stewart Rhodes is saying, we have an

20   armed QRF on standby.

21           So although you cannot see people with long guns

22   walking into the hotel, there is a reason for that.  That would

23   cause an alarm.  So these are, again, text messages that

24   describe armed weapons, and then circumstantial evidence of

25   weapons in the -- of bags that would look like they would carry

1    weapons moving into a hotel.

2            THE COURT:  Go ahead.  Thank you.

3            MR. MANZO:  So, as the rest of the conspiracy moved

4    forward and -- and advanced into the Capitol, the defendant

5    stood back in the hotel and he started messaging the rest of

6    the conspiracy.

7            Vallejo, back at the hotel, I'm outfitted.  I have two

8    trucks available.  Let me know how I can assist.  QRF standing

9    by at a hotel.  Just say the word.

10           Notice the defendant's precise words.  He refers to

11   himself as the QRF.  A QRF is, by nature, armed, quick reaction

12   force.  It's a military term.

13           He also described himself as outfitted.  Vallejo is

14   not volunteering to drive people.  He would not need to be

15   outfitted to drive a car to pick people up.  There is only one

16   logical interpretation of these words, that's Vallejo is armed

17   and ready to invade the city in aid of the violence.

18           In addition, we have a few messages that we did not

19   put forward in the detention memo.  As the riots are going on

20   in the Capitol, Vallejo is texting that:  We have taken the

21   Capitol, at the same time he's urging violence back here in

22   Arizona.  He messaged somebody in Arizona saying, so, have you

23   secured the Arizona Capitol yet, slacker?  Waiting on you now.

24           Later that afternoon, on January 6th at 3:57 p.m., the

25   defendant declared:  We are at war.  And, again, wars are

1    fought with weapons.  He attempted to launch a drone at that

2    point and declared that he was not leaving.

3          Think about the unprecedented moment in our nation's

4    history.  The military had been called in to resecure the

5    Capitol.  And rather than express horror at the situation, the

6    defendant is attempting to launch a drone to surveil the front

7    lines against the troops who have been sworn to protect us.

8    There is absolutely nothing defensive about Vallejo's actions.

9          After the unprecedented violence of January 6th,

10   Vallejo declared, we'll be back at 6:00 a.m. to do it again.

11   On the evening of January 6th, he vowed to ignore the curfew

12   that had been imposed in the city.  On the next morning at

13   5:46 a.m., that morning he messaged his coconspirators in a

14   Signal chat that he intended to probe the defense line right

15   now, and that he was departing for recon.  Stewart, as in

16   Stewart Rhodes, call me when you're up.

17         Make no mistake about that, the defense line is law

18   enforcement and the United States military trying to guard the

19   Capitol.  The defendant's words and actions show the Court who

20   he is, an individual violently attempting to prevent the

21   peaceful transfer of power.

22         Throughout the conspiracy, Vallejo pledged fealty to

23   his commander, Stewart Rhodes.  After January 6th, as

24   Mr. Rhodes continued to amass weapons and further plan for his

25   civil war, Vallejo attempted to meet up with him and continued

1  to take directions from him.

2       THE COURT:  Let me get back to that in a second and

3  ask another question about January 6th.

4       Regarding Mr. Vallejo, I -- it appears to be agreed

5  that he did not respond, that he did not initiate the quick

6  reaction force and the two trucks; is that correct?

7       MR. MANZO:  Correct.

8       THE COURT:  Is it the theory of your case that the

9  order was never given by Rhodes and that's why he didn't

10 execute that order?

11      MR. MANZO:  Yes, there is multiple theories that, I

12 think, we could -- we could go forward on, that Stewart Rhodes

13 texted about a Serbian plan, as he called it, it was an

14 eight-step plan.  I think it's mentioned in the -- in the

15 detention memo.  And one of that was that law enforcement was

16 going to join with the rioters.  And that's what Stewart Rhodes

17 alleges happened in Serbia.

18      Law enforcement stood tall that day.  They fought back

19 against the rioters and were able to secure the Capitol.  If

20 law enforcement had broken and given in, does Stewart Rhodes

21 activate the armed forces to come in from Virginia, maybe.  On

22 the other hand, again, the rioters were successful in

23 preventing the Electoral College vote from proceeding, at least

24 delaying it.  So maybe he didn't need -- he didn't need Vallejo

25 to come in at that point.  But we all agree that Vallejo did

1    not cross into Washington, D.C., at that time, armed.

2            And just the Court's indulgence for one moment, if I

3    could take a sip of water.

4            THE COURT:  That's fine.  Let me ask you another

5    question about the statement of having two trucks at the ready.

6            Has there been any corroboration of that point --

7            MR. MANZO:  Yes.

8            THE COURT:  -- that there were, in fact, two vehicles

9    of some kind?

10           MR. MANZO:  Yes.  We've got statements from multiple

11   -- or multiple individuals that there were trucks available.

12   And we have Vallejo's own phone and his statements that the day

13   before he had actually lost his truck in Washington, D.C., and

14   then found it the next day in Washington, D.C., and brought it

15   back to the hotel on the morning of January 6th.

16           THE COURT:  So he, in fact, owned one of the trucks,

17   is your theory?

18           MR. MANZO:  Yes.

19           THE COURT:  Okay.  Go ahead.

20           MR. MANZO:  Turning back to Mr. Rhodes and how

21   Mr. Vallejo was under his sway.  Mr. Rhodes is an individual

22   that was calling for bloody, massive revolution, and that the

23   current administration is an occupying enemy force.  Even

24   though Mr. Rhodes is now arrested, he still could hold sway

25   over Mr. Vallejo.  And we don't know who the next com -- who

1    Mr. Vallejo's next commander will be.

2            The government acknowledges that Mr. Vallejo is not a

3    young man, but he is a dangerous man.  In a guerilla war,

4    everyone plays a part.  The defendant is a loyal follower of

5    someone who is waging war against the United States.

6    Mr. Vallejo is one of Mr. Rhodes' soldiers.  He stood ready and

7    willing to provide lethal force in aid of the attack on the

8    Capitol, and after the Capitol hearing remained unrepentant.

9    And even in recent days, he's expressed his willingness to use

10   lethal means to achieve his political objection -- objections

11   in regard to the pandemic.  We outlined that in the memo.

12           THE COURT:  It did not list a date, it just said

13   December.  Do you have an actual date?  There was a Twitter

14   reference.

15           MR. MANZO:  Yes, I believe it was December of 2021.  I

16   believe it was December 30, but we can also probably just pull

17   it up right now.

18           THE COURT:  So late December?

19           MR. MANZO:  Yes.

20           THE COURT:  So that does raise my question of what, if

21   you know, was Mr. Vallejo doing between February 1st and the

22   time of his arrest?  Other than that Twitter quote, was he

23   residing in Arizona, was he working, was he involved in any

24   other activity that incited violence?

25           MR. MANZO:  At one point we know that he was

UNITED STATES DISTRICT COURT

attempting to meet up with Stewart Rhodes in Texas, as Stewart

Rhodes was requiring larger and larger caches of weapons.  We

know at other points that agents have interviewed him at a

rural compound in Arizona.

THE COURT:  Law enforcement interviewed Mr. Vallejo in

Arizona?

MR. MANZO:  Attempted to, yes, and executed a search

warrant.

THE COURT:  When did that happen?

MR. MANZO:  That happened in May of 2021 and June.

THE COURT:  At that execution of the search warrant,

were any firearms found?

MR. MANZO:  It was not a Rule 41 premises search

warrant, it was an execution of a search warrant on a cellular

device.

THE COURT:  To your knowledge, has Mr. Vallejo been

interviewed by any law enforcement since February --

MR. MANZO:  Yes.

THE COURT:  -- 2021?

MR. MANZO:  He has, Your Honor.

THE COURT:  Was he interviewed about this incident?

MR. MANZO:  No, actually, Your Honor, I'm going to

take that back.  He has not actually spoken to law enforcement

during that time.

THE COURT:  I don't want to get too far afield.  My

1    point is just to have a sense of what Mr. Vallejo has been

2    doing since this happened.  It might be relevant to the issue

3    of danger.

4         Was he continuing to encourage violence, or was he

5    back engaged in what otherwise appears to be a fairly routine

6    life, a law-abiding life, prior to all of these allegations?

7         MR. MANZO:  Well, you know, we don't -- we can't keep

8    full track of him, but what we know is that January 6th was not

9    a one-off event.  That after January 6th, he turned back to --

10   well, on the morning of January 6th, he's going back to probe

11   the lines of the government, probe the lines of law

12   enforcement.  And then he's not just done -- he doesn't say,

13   that was a wild time, he doesn't regret the actions, but he's

14   saying we're going to do it again.  And then he's continuing to

15   meet with Stewart Rhodes up -- or attempting to meet with

16   Stewart Rhodes up through January 20th to continue to advance

17   the -- the conspiracy to prevent the transfer of power.

18         THE COURT:  Thank you.

19         MR. MANZO:  What he's done since then, whether it's

20   nefarious or good on his property in Arizona, we don't have

21   particular insight to that, but we know that during the

22   critical time here, this was not a one-off event.  This is well

23   planned.  This is an individual who traveled across the country

24   with weapons, and then continuously during the riot itself

25   volunteered.  And he's also pledged to wage guerilla war.

1           There is no statement that we've been able to find on

2   his online presence that says, well, I don't really want

3   guerilla war anymore.  I don't want a civil war anymore.  So

4   whether he's amassing weapons or whether he's sitting watching

5   TV, we can't say, but we believe that he's a danger and we

6   cannot take the risk to allow him to remain in the community,

7   given his words and actions, especially around January 6th.

8           THE COURT:  Okay.

9           MR. MANZO:  We've got a couple more insights too.

10          In March he attempted to join a Signal chat with

11  Mr. Rhodes, so that's, you know, well after January of 2020,

12  and was -- stated how important it was to keep communications

13  secure.

14          And then on top of that, we've got recent statements

15  of Mr. Vallejo on Twitter where he called the election itself

16  the insurrection and not January 6th.  Those statements

17  continue to deny, basically, what happened on January 6th, and

18  we think it goes to his dangerousness.

19          THE COURT:  I want to make clear too, when I've asked

20  you about this, I'm not presuming to ask you about the entire

21  investigation.  And I don't think you're making avowals about

22  everything that you know.  I'm merely asking you about evidence

23  you're presenting here.

24          So, to be clear, for the record, I don't consider

25  these avowals about the entire investigation nor have I

1    intended to do that.  I want to make sure I understand the

2    quantum of evidence you're presenting to me for this hearing.

3            So, with that, are you concluded?

4            MR. MANZO:  Yes.  Just to summarize, basically, here,

5    the defendant engaged in an unprecedented conspiracy to

6    obstruct Congress.  There is no reason to believe that he would

7    not continue to obstruct this investigation, as other people

8    have pledged to do.

9            He's said in Signal messages that he would do anything

10   for Stewart Rhodes.  He's facing a substantial sentence of

11   incarceration and would have a strong motivation to flee.

12           We ask that you just, in conclusion, credit the

13   defendant at his own words.  He volunteered to aid his

14   commander, Stewart Rhodes, in the first steps of a massive,

15   bloody civil war.  He traveled across the country by car while

16   armed.  He pledged a guerilla war if Congress certified the

17   Electoral College vote.  He offered to drive outfitted vehicles

18   and to bring the QRF into the city as his fellow coconspirators

19   stormed the Capitol.  He attempted to launch a drone to spy on

20   the military and law enforcement resecuring the Capitol.  He

21   pledged to probe the lines of the military and law enforcement

22   securing the Capitol on the next day following the attack.  He

23   then continued to plot up through the inauguration with Stewart

24   Rhodes when, in the words of another Arizona QRF member,

25   peaceful protest was impossible.

1          He's a dangerous man.  To take him at anything but his

2     own words is an intolerable risk.

3          Thank you.

4          THE COURT:  Ms. Jang.

5          Well, first, Mr. Vallejo, the government's concluded

6     speaking.  Were you able to hear what they said?

7          THE DEFENDANT:  That's me?  Yes, I heard every word.

8          THE COURT:  Next I'll turn to your counsel.

9          Ms. Jang, you're welcome to stand there or approach,

10    either one.

11         MS. JANG:  I'd like to approach.

12         THE COURT:  Mr. Vallejo, this will be your attorney

13    speaking.

14         Please proceed.

15         THE DEFENDANT:  Thank you.

16         MS. JANG:  Thank you, Your Honor.

17         18 U.S.C. 3142(b) says that the judicial officer shall

18    order the pretrial release of the person on personal

19    recognizance unless there is no condition that will reasonably

20    assure the appearance of the person and the safety of any other

21    person in the community.

22         Your Honor, there are 11 named defendants in this

23    indictment listed in descending order of culpability, and at

24    the very bottom of that list is Mr. Edward Vallejo.  And as

25    Pretrial Services has indicated, Mr. Vallejo should be released

1    as he is neither a flight risk nor a danger.

2          Your Honor, Mr. Vallejo is not a flight risk.  His

3    name is Edward Vallejo.  He is 63 years old.  He has never used

4    another name.  He has never hidden his identity.  He served in

5    the Army in the seventies at Fort Polk, Louisiana, and he was

6    medically discharged due to his asthma.

7          He has lived in Arizona for over two decades, for

8    24 years, and he has a wife of 35 years in September.  And she

9    is in the courtroom here today.

10         He also has a brother who lives in Arizona with whom

11   he maintains regular communication.  His brother is also a

12   veteran, was a paratrooper.  They talk often about PTSD and

13   struggles about the military.  And Mr. Vallejo also has two

14   sisters here in Arizona.

15         His whole community is here, Your Honor.  He has no

16   passport.  He has never been outside the country.  And, Your

17   Honor, he serves his community.  For the past year he has been

18   involved in serving his community.  He has been -- he is the

19   program director for interns and residents with Homefront

20   Battle Buddies, which is a nonprofit organization that helps

21   veterans transition to society.

22         He is an Alcoholics Anonymous sponsor.  He has been --

23   he has not had a drop of alcohol in 35 years.  And he works

24   with people, specifically veterans, dealing with sobriety

25   issues, PTSD, and suicidal ideations.  He maintains contact

with them frequently, eats with them, calls them, makes sure

they're doing well.  He is accountable to them and they rely on

his presence in their lives and in the community.  Your Honor,

Mr. Vallejo is not a flight risk.

Mr. Vallejo is also not a danger.  He does not have

criminal history, and there is nothing in his past that

indicates violence or violent behavior.  Pretrial Services

reported that he had no engagement with law enforcement other

than a speeding ticket a couple months ago and marijuana use

nearly four decades ago.  And, importantly, there are no other

engagements with law enforcement since the alleged incident in

the indictment.

Your Honor, Mr. Vallejo is also not a danger, because

even if the allegations were true, Mr. Vallejo played a minor

role, if at all.  Like I noted, he is last on the indictment.

THE COURT:  Let me ask you.

MS. JANG:  Yes, Your Honor.

THE COURT:  I don't take it at face value that because

someone is listed at the bottom, they're necessarily less

culpable than other individuals.  And, more importantly, aren't

I required just to assess his history and characteristics and

all of the factors for him personally, and not consider, you

know, his relation to other defendants, except for, perhaps,

role in the offense?

MS. JANG:  Yes, Your Honor.  And so, again, even if

1    the allegations were true, there are -- there is other

2    indications that he is not a danger.

3          The government has noted -- has conceded that they

4    don't have video evidence of him ever stepping foot on the

5    Capitol, going into the rotunda.  He was allegedly outside of

6    the Capitol.

7          The government also notes that he was a participant of

8    just one of the planning chats and took orders throughout the

9    entire event.  And this indicates that he would have played a

10   minor role of the alleged events.

11         And more -- most importantly, Your Honor, Mr. Vallejo

12   is not a danger because the government had all this

13   information, they investigated, they watched videos, they

14   reviewed evidence.  The government knew where Mr. Vallejo was

15   and what he was doing, and they did not make a move on

16   Mr. Vallejo until over a year after the alleged incidents to

17   arrest and indict him.  It took them until over the anniversary

18   to arrest and indict him.  It is clear that he does not pose

19   any danger to society.

20         Your Honor, there are release conditions available to

21   ensure his appearance and safety to the community.  Pretrial

22   Services has indicated that he is -- that there are six

23   conditions and the remote internet and computer monitoring

24   program available for Mr. Vallejo, and they are comfortable

25   that with these release conditions they can ensure that he

1    appears and that there is safety to the community.

2          All of the government's concerns are addressed with

3    these conditions listed by Pretrial Services, including

4    avoiding all contact with alleged co-defendants, monitoring his

5    internet activities, restricting his possession of firearms.

6    Your Honor, we are also willing to accept any other conditions

7    that the Court feels is necessary to impose, including ankle

8    monitoring, or drug testing, curfews, or even the use of a

9    third-party custodian.  And, Your Honor, Mr. Vallejo's wife can

10   be that custodian, as she has no criminal history and she lives

11   here in Phoenix, Arizona.

12         I'd just like to make one quick note about a risk of

13   detention.  Pretrial Services noted that he, Mr. Vallejo, was

14   diagnosed with childhood -- asthma as a child.  Asthma, as many

15   of us know, causes difficulty breathing, it restricts the

16   airways to the lungs.  And this is a lifelong condition, such

17   that he was discharged from the military as a result of asthma.

18   And so being in -- being in detention would put him in harm's

19   way, as this Court is well aware, that COVID-19 and omicron

20   target the respiratory system.

21         Your Honor, in the Ninth Circuit it is clear that the

22   weight of the evidence is the least important factor when

23   considering detention.  The Court should not make any pretrial

24   determinations of a person's guilt, and the statute prohibits

25   this.  Mr. Vallejo is innocent until proven guilty.

1          Given that this Court is required to impose the least

2   restrictive conditions to reasonably assure his appearance and

3   safety to the community, given that Mr. Vallejo is presumed

4   innocent until proven guilty, given that there is no evidence

5   that he has been a danger or a flight in the year since the

6   alleged incidents, and given that Pretrial Services recommends

7   his release with conditions, we respectfully request that this

8   Court follow Pretrial Services' recommendation and release

9   Mr. Vallejo with conditions.

10          THE COURT:  I have a question, if you know, because

11  you are often at a disadvantage in having all the information.

12  The government's investigated this case for quite awhile.

13          But is there any information that Mr. Vallejo knew he

14  was under investigation or potential indictment before he was

15  arrested?

16          MS. JANG:  Your Honor, I am not aware of that.  I

17  don't -- I have not had the chance to speak with Mr. Vallejo

18  about that.

19          THE COURT:  I'll ask the government as well.

20          It goes to your point of what he was doing over the

21  last year.  Certainly someone who knew they may be indicted or

22  had been charged, how they react to that would have material

23  bearing, so I'll ask the government.

24          Any final points?

25          MS. JANG:  No, Your Honor.

1          THE COURT:  Okay.  Thank you.

2          Oh, I do have one other point.  You mentioned that

3    Mrs. Vallejo is here.

4          Ma'am, good afternoon.  Thank you for being here.

5          Who else would you like to identify?  Mr. Vallejo

6    can't see anyone, and I don't know that he's aware of who is

7    here on his behalf.  I'd like to note for the record as well.

8          MS. JANG:  Your Honor, I am not aware of all the

9    names.  I believe it's Adam Kokesh, and I don't -- I don't

10   recall the -- the woman sitting next to him.

11         A VOICE:  It's Joey Lee (phonetic).

12         THE COURT:  All right.  Thank you, ma'am.

13         Well, there are others, Mr. Vallejo, who are here in

14   court in your support.

15         THE DEFENDANT:  Thank you.

16         THE COURT:  All right.  Ms. Jang, thank you.

17         MS. JANG:  Thank you.

18         THE COURT:  All right.  From the government.

19         MR. MANZO:  Thank you, Your Honor.  Just a couple

20   points to follow up here.

21         There is no reason in the indictment to believe that

22   the defendants are listed in any kind of order of culpability,

23   far from it.  Mr. Vallejo did not play a minor role during the

24   multi-month conspiracy that's been indicted by the grand jury

25   in Washington, D.C.  In particular, on January 6th itself, he

was the one who was, quote-unquote, outfitted, who was -- who

admitted and said himself is the QRF.  That's the armed force

of this.  To say that he's the last one on is just not accurate

to say that he's anything but a key, very key member in this

conspiracy.

THE COURT:  Let me ask you a question about his actual

role.  I'm not sure it is essential, but I would like to know.

There are two ways to take his statement.  One is that

he was the actual quick reaction force and that he was armed

and prepared to respond.  The other is that he would, under

your theory, have one of the two trucks and drive firearms and

ammunition to the Capitol for other people.

How do you know which one of those -- and this is your

theory -- but how do you -- how are you able to tell me that he

was actually a person who would have been armed rather than a

person who merely delivered weapons to others?

MR. MANZO:  Can you -- sorry, Your Honor.  So how do I

-- how do -- what's our theory that he is the one who was

armed?

THE COURT:  Or evidence, more importantly.  This is

your case.  So you're suggesting to me that he was the quick

reaction force.  I assume by that you're saying that he was the

person who was prepared and outfitted to respond with a weapon.

How do I know he wasn't the person just driving a

truck and delivering the weapons to other people?

1          MR. MANZO:  Well, so there -- there is -- from witness

2    statements that we have, there is two main people who are in

3    the Arizona QRF.  There is multiple QRFs, which is consistent

4    with his text message where -- or a Signal message that there

5    is -- he has two trucks.  Those people are guarding guns in the

6    hotel.

7          In order to get the guns in the city, presumably, they

8    would be transported on the trucks by -- by Mr. Vallejo and the

9    other Arizona QRF member.  So that -- that's our theory of the

10   case, and I think it's consistent with -- with Mr. Vallejo's

11   messages that he is the QRF.  The QRF are the people who -- who

12   are armed ready to come in.

13         THE COURT:  All right.  Please proceed.

14         MR. MANZO:  Just a couple other quick rebuttal points

15   here about how a year has passed.

16         Investigations take time, Your Honor.  If -- if all

17   these messages were -- that we've gathered in the course of the

18   last year we had in real time, this would be a different case.

19   But we've had to amass a huge investigation with, you know, in

20   this conspiracy alone, more than 20 people.  The fact that it's

21   -- we've been able to do it in a year I think speaks to the

22   pace that we've worked at.  It says nothing about the

23   dangerousness of Mr. Vallejo.

24         In addition, in this case we've had obstructive

25   behavior by other individuals deleting messages, and, in fact,

1    telling the conspiracy to delete all their messages.

2           And I think the key thing we want to hammer in right

3    now is that, I think it goes without saying, that based on his

4    words and his actions in the -- during the multi-monthlong

5    conspiracy here, that Mr. Vallejo was a dangerous person.

6    That's what the grand jury has indicted on, that he was the one

7    traveling across the country, and then during the middle of the

8    riot is offering to bring the outfitted QRF into the city, and

9    he's the one pushing, pushing, pushing to go probe the lines,

10   to launch the drone, which is just, when you take a step back,

11   mind boggling conduct.  This is something that in December,

12   before the January 6th event, you would say, wow, this is

13   insane, but that's what he was doing.

14          And then it didn't stop.  There is no reason to think

15   that he's renounced violence, that he has moved on with his

16   life, that he's no longer a danger.  We know that through the

17   inauguration he's still trying to meet with Mr. Rhodes.  He's

18   saying, what's next?  How can we help?  And then in March he's

19   trying to get on Signal chats.  And then all the way through

20   December he's still posting on Twitter.  And, again, we don't

21   have direct access to him every day, we cannot see what he's up

22   to, but he's posting on Twitter violent goals, that he's saying

23   that he's going to commit violence if his political aims in

24   regard to the pandemic are not fulfilled.

25          That's someone who has showed, not only during the key

1    periods of the indictment itself a commitment to violence, but

2    still continues to this day.  I don't think that we can just

3    believe in the passage of time, when somebody who has taken

4    actions that are extreme, that he's declared that there is

5    going to be a guerilla war, suddenly renounces that.  There is

6    no reason.  There is no reason to think that.

7         And although we acknowledge the family here in the

8    courtroom, they weren't able to stop what he did on

9    January 6th.  They weren't there to stop him, if he had chosen

10   to cross that river into D.C. with those weapons.  While they

11   might be here to support him now, we don't think that -- that

12   their affect or their presence should be credited to prevent

13   him from being held today.  We think that they were not able to

14   stop him in the past, there is no reason to believe now that

15   he's charged with the seditious conspiracy, that they would be

16   able to do so now.

17        He's been obstructive in his -- in his actions.  This

18   is something the grand jury found, that this was an

19   unprecedented obstruction of Congress.  We think that if he was

20   released, he'd have a potential to flee as well.  And, so for

21   all those reasons, but, most importantly, his dangerousness,

22   we'd ask that he be held.

23        THE COURT:  One final question.  To your knowledge,

24   did Mr. Vallejo have knowledge or reasons to suspect that he

25   was under investigation or potential indictment up until the

1    time he was arrested on the warrant?

2         MR. MANZO:  A warrant was executed on his phone.  He

3    was never given a target letter or something like that.  There

4    was no pre-arrest negotiations that would suggest that -- that

5    he -- that an arrest was imminent.

6         THE COURT:  The reason I ask, if someone is

7    interviewed six months ago about the investigation and told,

8    you're likely to be indicted, and they stay at their house and

9    otherwise keep their job and don't change their lives, that

10   would have a material bearing.  Conversely, if someone fled

11   after hearing that, then that would have material bearing.

12        So it appears, as far as you know now, that his arrest

13   was for serious notice that he had of the indictment or the

14   investigation of him?

15        MR. MANZO:  Correct.  Correct, Your Honor.

16        THE COURT:  Okay.  Mr. Vallejo, the government's

17   attorney has stopped.  I'll give your attorney one last second

18   to add anything factually to the record.  I certainly

19   understand the arguments.

20        Ms. Jang.

21        MS. JANG:  Your Honor, just a couple quick points.

22        As it relates to potentially obstruct -- obstructive

23   behavior, Mr. Vallejo has not been indicted on that charge,

24   others have.  And I believe he probably would have had the

25   opportunity, if he had so desired, to delete that -- those

1    messages or tamper with evidence.

2            But, more importantly, there are conditions that can

3    address that concern.  The conditions being that, you know,

4    there is going to be monitoring on his cell phone, or that he

5    is prohibited from tampering with potential evidence in this

6    case.

7            Secondly, the government can't have it both ways.

8    Either his words were so dangerous that he needed to be

9    detained back then, or he has the -- the words were just words

10   and he is being -- he was arrested in January.

11           Your Honor, I believe it would be inappropriate to

12   detain him mostly based on social media postings and attempts

13   to join Signal chats.

14           And, finally, as it relates to the potential that he

15   may have known his -- that he was being investigated, a search

16   warrant was executed on his phone, so I would assume that he --

17   he had some knowledge that there was an investigation going on.

18   And -- and in February, or in the spring of 2021, others in the

19   -- in the alleged conspiracy were indicted, so I'm sure he had

20   some notice and had all opportunity to flee and/or tamper with

21   evidence.

22           Thank you, Your Honor.

23           THE COURT:  All right.  I understand that point.  I'm

24   not sure I agree with it, but I'll make that finding in a

25   minute.

1          Mr. Vallejo, that concludes the attorneys'

2    discussions.  Were you able to hear them all?

3          THE DEFENDANT:  Yes, I was, sir.  Thank you.

4          THE COURT:  Okay.  Good.

5          In every case involving detention, Mr. Vallejo, there

6    are four factors that the courts consider.  The first is the

7    nature and circumstances of the offenses charged.

8          Undoubtedly here, this indictment alleges a conspiracy

9    to threaten the very fabric of democracy.  The allegations here

10   are this was a conspiracy to use violence, if necessary, to

11   stop the peaceful transfer of presidential power.

12         The allegations include assertions that deadly force

13   was potentially contemplated, that ammunition and weapons were

14   assembled.  There is in the indictment a paragraph at 11 that

15   actual force was used by some of the people who entered the

16   Capitol, so, undoubtedly, this factor, the nature and

17   circumstances of the offense, is very serious.  This was a very

18   strong threat to our nation.  This factor favors detention.

19         Regarding your role, I do not see at this point that

20   you were a minor role participant as alleged.  I'll note, as we

21   all know, that you are assumed and you are presumed to be

22   innocent of these offenses.  These are merely findings

23   regarding the evidence before me now.  But, as alleged here,

24   your role was to stay back, allegedly, with the weapons and the

25   ammunition in a vehicle, and to deliver them, if directed by

1    Mr. Rhodes.  You had planned that.  You drove from Arizona to

2    the District of Columbia.  One of your vehicles was involved.

3    You have allegedly brought your own firearms and had, what

4    appear to the Court at this time, other firearms available that

5    had been collected and assembled by the group.  In sum, again,

6    this factor strongly favors detention.

7            The weight of the evidence of dangerousness and flight

8    is mixed.  And, in this way, as I talk more about your history

9    and characteristics, there is also a divergence.

10           Regarding your risk of flight, the government's

11   alleged that you're, essentially, so unlaw abiding that you

12   would attempt to overthrow this election; that because of your

13   statements publically, both on a podcast, on Twitter, and

14   evidence assembled in this investigation, that the weight of

15   evidence regarding your flight is strong.  On the other hand,

16   there are a number of factors in your favor regarding your risk

17   of flight.  And I'll get to those in a minute.

18           Let me just give you a quick overview of these,

19   because, regarding danger, there is compelling evidence

20   regarding your potential for danger.  Aside from the facts that

21   I listed and the information that's before the Court, at its

22   simplest, Mr. Vallejo, it appears that you were passionate in

23   your belief regarding the outcome of the election.  And the

24   government here has alleged you crossed a very serious line in

25   attempting to overthrow the results of the election, and you

1    did so in a way that was, with other people, contemplated

2    through force and potential violence.

3            At this point, to this Court, it's clear that you

4    believe so strongly in that conduct, you prepared for it, you

5    traveled there, you were ready to act.  And if Mr. Rhodes had

6    sent the order, you would have complied.  And that meant that

7    you would have, in some way, dispatched a quick reaction force

8    to the Capitol with alleged weapons.  And it's certainly

9    unknown what would have happened at that point.  But the order

10   was not given.  But I'm convinced that, had it been given, you

11   believe so passionately in this cause that you would have

12   responded on that day and followed out that order.  So the

13   weight of the evidence regarding danger is very strong.

14           The weight of evidence regarding flight, though, is

15   mixed.  And it may seem strange to think that someone who may

16   be involved in such a dangerous endeavor would also comply with

17   court orders and the less risk of flight.  But as I'll note for

18   a moment -- in a moment, you have a strong history of

19   compliance and law-abiding conduct.  Doesn't mean you're not

20   necessarily dangerous, but these are different.  The law

21   requires two independent showings, which means that they're

22   different.

23           So regarding the nature and circumstances of the

24   offenses -- I'm sorry, regarding the weight of the evidence of

25   danger, that factor favors detention as to danger, and,

1    regarding flight, it's neutral.

2            So let me get to your history and characteristics.  Of

3    course you know these things, but let me repeat them for the

4    record.  You served in the Army from 1977 to 1978.  You served

5    this country.  You currently are actively involved in the

6    Homefront Battle Buddies program to serve veterans.  I have no

7    doubt of your passion for veterans and your service to the

8    country in the past.

9            You have lived in Arizona for decades.  You have no

10   criminal history except for a minor incident back in 1983.

11   You, essentially, have zero criminal history.

12           You have no drug usage problems.  You don't drink.

13   You've been sober for decades.  You help other people.

14           You have people here in support of you.  Your wife is

15   here in your support.  You have been working for several months

16   and you've had various jobs off and on.

17           Weighed against that you have these most recent

18   allegations, which are, of course, very serious.  And what to

19   do regarding those, you have -- you're 63 years old.  You have

20   decades of law-abiding conduct, serving our country, helping

21   other veterans.  And then here the allegations are you crossed

22   a very serious line which could have resulted in very serious

23   injury or death to other people if -- if it had gone forward.

24   It didn't.  But regarding your risk of flight, there are a lot

25   of factors to believe that you certainly might appear.

1          On the other hand, the danger that you present

2     regarding your history and characteristics is also mixed.  But

3     it wasn't just these actions on -- in December of 2021, there

4     is also the statement which is contained in the government's

5     memorandum at page 13, where you made a statement regarding

6     vaccines and -- and this is from December of 2021 -- that you

7     will never achieve vaccine equality as long as I and others

8     like me are alive.  I will die first and that's only when I run

9     out of ammunition.

10          And it is important for me to understand your, as best

11    I can at this point, where you are as a person regarding your

12    potential violence.  And I understand this is just a statement

13    that was made, it doesn't necessarily mean that you intended to

14    do anything about this.  No judge could ever know exactly what

15    someone intends merely when they say it, but it is a factor

16    that I consider.  There appears to be no evidence before me now

17    of remorse, or in your statements past January of 2021.  And,

18    conversely, there is evidence here that even now you're making

19    incendiary comments regarding ammunition and potential

20    violence.  So it's before the Court and I've considered it.

21          Regarding history and characteristics regarding

22    flight, I find that factor favors release.  On the issue of

23    danger, I find that, even though this is a higher standard of

24    clear and convincing evidence, the government's established

25    that when I weigh all of the factors, the planning, your

involvement, your statements afterwards, the potential

violence, that your more recent conduct regarding these events

outweighs your past compliance, and the government has shown at

this time this factor regarding danger of history and

characteristics favors detention.

And then, Mr. Vallejo, the final factor is the nature

and seriousness of the danger to the community if you were

released.  I think the simple point for the Court here is, I go

back to what happened back in January 6th, and I've already

stated it, I think that if Mr. Rhodes had given that order, you

would have complied.  And that means there is the potential

that as, I believe you used the word soldier, but certainly

that's how you described yourself, that you would take orders,

if necessary, to fulfill what you believe is important to you,

and, therefore, you are a serious danger at this time.  That

factor favors detention.

I've considered ankle monitoring.  I've considered

that your wife is here and you have people who support you.

I've also tried to get a sense of what's happened over the last

year, because that does matter.  But I don't think anyone at

your age, 63, and as strongly as you believe in these things,

can stop you from acting one way or the other.  I think you

have strong opinions and I don't think that those factors would

-- would change your compliance or noncompliance.

And, finally, I'm sympathetic to the fact that you

1    have asthma.  I've considered thoughtfully your attorney's

2    point that you may be of increased risk in confinement because

3    of that, and the jeopardy that COVID might place towards you.

4    In fairness I've considered what -- well, I don't think I

5    should consider your vaccination status because it's not before

6    the Court.  Your statement would imply that you are not

7    vaccinated, but I'll take that statement back.

8            What is important is I have considered your asthma,

9    and I am sympathetic to it, but when I weigh it, and I do

10   include it in these findings, and what I conclude in all of

11   these is, number one, the lower standard of flight risk is just

12   neutral to the Court.  And because the government must

13   establish to preponderance of the evidence, I don't find flight

14   risk.

15           I do, however, find that you are a danger.  That's the

16   greater standard of clear and convincing evidence.  For

17   whatever reasons that you hold true to yourself, I do believe

18   at this point you were prepared to act, made those points clear

19   to the record today, and, because of that, the Court will order

20   your detention as a danger.  And I do not find that there are

21   any conditions sufficient to ameliorate that risk such that you

22   be released.

23           So, Mr. Vallejo, in simple terms, that means you'll be

24   detained while your case goes forward.  You'll be transported

25   by the marshal service to the District of Columbia.  Any appeal

1  of this order goes to the district judge to which this case is

2  assigned in the District of Columbia.

3          And regarding transport that's -- I cannot tell you

4  the time it will take you to be transported.  It will,

5  obviously, take at least several days.  It can take more than

6  that, Mr. Vallejo, we don't know.  That's the responsibility of

7  the United States Marshal Service.

8          Mr. Vallejo, I'm sure you don't agree with this

9  ruling, but I want to at least see if you've heard it.

10          Have you heard it, sir?

11          THE DEFENDANT:  I heard every word, sir.

12          THE COURT:  All right.  Thank you for listening

13  closely.

14          Let me turn to your attorney now and see if there is

15  anything else to add to the record?

16          MS. JANG:  No, Your Honor.  Thank you.

17          THE COURT:  All right.  Ms. Jang, I know this is a

18  larger than normal proceeding, but if there is anything you'd

19  like to tell Mr. Vallejo.  I know that sometimes it's difficult

20  for you to contact your clients in a speedy way, so is there

21  anything else that you need to tell him before we adjourn?

22          MS. JANG:  Yes.  If he could give me a call at the

23  1-800 number tomorrow or the following week, that would be

24  great.

25          THE COURT:  All right.  Mr. Vallejo, your attorney has

1     asked that you call her tomorrow or as soon as possible.

2            Do you understand?

3            THE DEFENDANT:  I heard that.  Thank you.

4            THE COURT:  You're welcome.  The 1-800 number should

5     be posted in regular areas, so I don't think you'll have a

6     problem --

7            THE DEFENDANT:  I have it.

8            THE COURT:  -- finding that.  Okay.

9            From the government, anything else to add?

10           MR. MANZO:  No, Your Honor.  Thank you.

11           THE COURT:  All right.  The Court will submit its

12    written findings as well.

13           With that, thank you all.

14           I do want to add, I appreciate everyone being here,

15    especially Mrs. Vallejo.  I know it takes time and effort.  I

16    consider it in every case.  Being involved in every step of a

17    case matters.

18           With that, we're adjourned.

19           A VOICE:  Thank you, Your Honor.

20           (The proceedings were adjourned.)

21                       *          *          *

22

23

24

25

```
1                        C E R T I F I C A T E

2

3              I, CHRISTINE M. COALY, court-approved transcriber,

4      certify that the foregoing is a correct transcript from the

5      official electronic sound recording of the proceedings in the

6      above-entitled matter.

7

8              DATED at Phoenix, Arizona, this 28th day of January,

9      2022.

10

11

12

13                                   /s/ Christine M. Coaly
                                     Christine M. Coaly, RMR, CRR
14

15

16

17

18

19

20

21

22

23

24

25
```